IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term

Grand Jury Sworn in on November 3, 2016

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | Case: 1:17-cr-00110<br>Assigned To : Judge Cooper, Christopher R.<br>Assign. Date : 6/8/2017<br>Description: INDICTMENT (B)<br>Case Related To: 17-CV-980 (CRC) |
| v. : | VIOLATION: |
| **SHAN SHI;** : | 18 U.S.C. § 1832 |
| **KUI BO;** : | (Theft of Trade Secrets) |
| **GANG LIU;** : | |
| **SAM OGOE;** : | FORFEITURE: |
| **UKA UCHE;** : | 18 U.S.C. §§ 981(a)(1)(C) and 2323; and<br>21 U.S.C. § 853(p); 28 U.S.C. § 2461(c) |
| **HUANG HUI; and** : | |
| **JOHNNY WAYNE RANDALL** : | |

## INDICTMENT

The Grand Jury charges that:

### COUNT ONE

(Conspiracy to Steal and Convert a Trade Secret)

At all times material to this Indictment:

1. Company A, whose name is substituted in the Indictment for purposes of confidentiality, was a multinational engineering firm whose business focused on the development of a highly advanced composite material known as syntactic foam. Company A's corporate headquarters are

1

in Sweden and it operates a subsidiary in Houston, Texas. Company A developed, sold and shipped, and intended to develop, sell and ship, syntactic foam in interstate and foreign commerce.

2. Syntactic foam consists of tiny hollow microspheres suspended in an epoxy resin. The combination of hollow spheres encased in epoxy creates a strong, light material ideal for a variety of applications. Strength and other performance characteristics can be improved by chemical surface treatment of the microspheres. Syntactic foam may be tailored for both commercial (oil exploration, etc.) and military use (including aerospace, underwater vehicles, and stealth technology).

3. The technology for creating syntactic foam was closely held by the dominant producers and sellers of syntactic foam, including Company A, which developed advancements in the technology through intensive and costly research and development ("R&D") over many years.

4. The government of the People's Republic of China ("PRC" or "China") publicly declared its desire to become a global marine power through the development of marine engineering equipment that could sustain great depths. To that end, PRC government agencies provided funding to establish a company in China in order to facilitate and increase innovative research and domestic manufacturing of syntactic foam.

5. Aware of the PRC's national priority, and in order to bypass the technical, expensive, and time-consuming R&D required to develop syntactic foam themselves, the individuals named in this Indictment acquired Company A's trade secrets relating to syntactic foam, without the authorization of Company A, and conveyed those trade secrets to the PRC company and others.

## THE DEFENDANTS AND RELATED ENTITIES

6. Taizhou CBM Future New Material Science and Technology Co. Ltd. ("CBMF"), is a

company located in Zhejiang Province, China. CBMF joined a "National Team of Marine Engineering" and a collaborative innovation center with PRC-Government entities, including Chinese State-Owned Enterprise ("SOE") 1, Chinese SOE 2, and Chinese SOE 3. The purpose of the National Team of Marine Engineering was to carry out joint ventures in deep-sea buoyancy material, military insulation spacer material, and new lightweight composite design to advance Chinese military and civilian interests. Specifically, CBMF intended to sell syntactic foam to both PRC-military and civilian Chinese SOEs. The project resulted in CBMF receiving 4M Yuan (approximately $650,000 USD) in Chinese-state funding. Chinese SOE 1 has extensive ties to the Chinese People's Liberation Army ("PLA") and the PLA Navy. Chinese SOE 2 develops, produces, and repairs military and commercial vessels, and related products. Chinese SOE 3 is responsible for offshore oil and gas exploration and exploitation in China. CBM International, Inc. ("CBMI") was established in March 2014, with CBMF as its only shareholder. PRC-Person 1, a person known to the grand jury, was the president of CBMF and provided funding for CBMI's operations.

7. Shan SHI is the President of CBMI and a shareholder of CBMF. SHI is a naturalized U.S. citizen who resides in Houston, Texas ("TX"). SHI has previously worked at Chinese shipbuilding entities where he was involved with the design of at least one PLA Navy ship. In a resume current as of March 2016, SHI indicated that he was currently employed as an overseas professor at Chinese SOE 1 and as a Senior Technical Advisor at Chinese SOE 2.

8. Kui BO is a Canadian citizen with a U.S. visa who has recently applied for U.S. Legal Permanent Resident status. BO resides in the Houston, TX area. BO was an employee of CBMI. At CBMI, Bo was involved in day-to-day operations.

9. Samuel OGOE was born in Ghana and is a naturalized U.S. citizen. OGOE was employed at CBMI until late 2015, when he became a contract employee. Previously, OGOE was employed by Company A as a Materials Development Manager where he had access to Company A proprietary and trade secret data beginning in or about 2008.

10. Johnny Wayne RANDALL is a U.S. citizen who was employed as a Production Supervisor by Company A in Houston where he had access to Company A proprietary and trade secret data beginning in or about 2007.

11. Uka UCHE was born in Nigeria and is a naturalized U.S. citizen. UCHE was employed by Company A in Houston where he worked as an Operations Systems Specialist and had access to Company A proprietary and trade secret data beginning in or about 2008.

12. Gang LIU is a Chinese citizen who has been present in the United States on a student visa since 2008. As of February 2017, LIU was a U.S. permanent resident alien. LIU previously worked for Company A as a Material Development Engineer and had access to proprietary and trade secret data beginning in or about 2013. LIU was highly involved in the R&D at CBMI.

13. Hui HUANG is a Chinese national who lives in China. HUANG is an employee of CBMF and is involved in many of the interactions and taskings to CBMI employees. HUANG has traveled to the United States on numerous occasions during his employment with CBMF.

14. Company E is a U.S. company developing a new remote operated vehicle ("ROV"). Company F is a U.S. company consulting for U.S. Company E to vet suppliers for the project.

**COMPANY A'S TRADE SECRETS AND CONFIDENTIALITY PROTECTIONS**

15. Company A is a global engineering company with a subsidiary in Houston, TX, that at all times pertinent to this indictment manufactured syntactic foam. Company A is one of the four

leading companies in the global syntactic foam market.

16. Company A has refined its syntactic foam design and development process over time. The production of the spheres for syntactic foam is a complex manufacturing process and Company A has continually improved its process over the past fifty years since its invention. Through its technical expertise, experience, and continued R&D investment, Company A has developed a process that afforded it a competitive advantage in the marketplace.

17. Company A's syntactic foam technology included, but was not limited to, the following trade secrets, each of which, if stolen by a competitor could give that competitor an unfair advantage:

   a. Trade Secret 1: Sphere Diameter Pressure and Density. Company A's technical innovation team worked on different formulations of resin for different spheres, including the performance of each formula at different depths and densities and the results of an experimental formula developed by Company A. Company A began experimenting with the new formula in 2013 or 2014. The new formula was used by Company A to increase strength while lowering the cost of producing the spheres. Access to this trade secret at Company A was password protected and restricted to a small number of Company A employees.

   b. Trade Secret 2: Density Calculations. The density of different 10mm macrospheres, including the performance of specific spheres pulled from a specific batch, was a Company A trade secret. Company A tested spheres for diameter and weight, with the results averaged to represent the entire batch. Company A density calculations would provide a competitor key information about the performance of a certain batch of

Company A's macrospheres, and benchmarks to meet in the production of the competitor's macrospheres. Access to such density calculations at Company A was password protected and restricted to a small number of Company A employees.

c. <u>Trade Secret 3</u>: Standard Operating Procedures ("SOP") for Hydrostatic Pressure Testing. Company A's SOP for hydrostatic testing, which is a necessary quality control measure prior to selling the syntactic foam product to customers was a trade secret.

d. <u>Trade Secret 4</u>: Manufacturing Process Data Models. Information developed by Company A regarding the number of coats on spheres and the performance of these spheres at certain densities was a Company A trade secret. Access to the models at Company A was password protected and restricted to a small number of Company A employees.

e. <u>Trade Secret 5</u>: Theoretically Calculated Syntactic Foam Formulation. A list of raw materials and various weights associated with those materials, which could be used to make syntactic foam, was a Company A trade secret. Access to this formulation at Company A was password protected and restricted to a small number of Company A employees.

f. <u>Trade Secret 6</u>: Macrosphere Rating & Cost. The costs for a newly developed formula related to syntactic foam was a Company A trade secret. Access to the macrosphere rating and cost information at Company A was password protected and restricted to a small number of Company A employees.

g. <u>Trade Secret 7</u>: Raw Material Prices. The prices Company A paid for various raw

materials at certain volumes in 2014 was a Company A trade secret. These prices were negotiated by Company A with its suppliers. Access to raw materials pricing at Company A was password protected and restricted to a small number of Company A employees.

18. The trade secrets listed above were considered such by Company A and were protected by Company A as confidential and proprietary information. Company A used a number of reasonable measures to protect its trade secrets and its confidential proprietary information, including, but not limited to:

    a. Limiting visitor access to its facilities;

    b. Requiring visitors to facilities to sign a confidentiality agreement;

    c. Limiting its computer network to designated employees;

    d. Limiting access to the network depending on work assignments.

    e. Requiring that approval for "limited access" folders may only be granted by an information technology administrator;

    f. Mandating that new hires receive and sign non-competition agreements and training regarding the protection of Company A trade secrets; and

    g. Requiring employees to execute non-competition agreements upon termination that included language not to divulge certain protected information, including Company A trade secrets;

## THE CONSPIRACY

19. Beginning on a date unknown to the Grand Jury but at least by, in or about March 2012, and continuing until on or about May 23, 2017, in the District of Columbia, and elsewhere, the

defendants, SHAN SHI, KUI BO, GANG LIU, SAM OGOE, UKA UCHE, HUANG HUI, and JOHNNY WAYNE RANDALL did knowingly and willfully combine, conspire, confederate, and agree with each other, and others known and unknown to the Grand Jury, to commit the following offenses:

a) With intent to convert a trade secret, that is related to or included in a product that is produced for or placed in interstate and foreign commerce, to the economic benefit of anyone other than the owner of the trade secret, and intending and knowing that the offense will, injure any owner of that trade secret, knowingly steals, and without authorization appropriates, takes, carries away, and conceals, and by fraud, artifice, and deception obtains such information, in violation of Title 18, United States Code, Section 1832(a)(1);

b) With intent to convert a trade secret, that is related to or included in a product that is produced for or placed in interstate and foreign commerce, to the economic benefit of anyone other than the owner of the trade secret, and intending and knowing that the offense will, injure any owner of that trade secret, knowingly, and without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, and conveys such information, in violation of Title 18, United States Code, Section 1832(a)(2); and

c) With intent to convert a trade secret, that is related to or included in a product that is produced for or placed in interstate and foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending and knowing that the offense will, injure any owner of that trade secret, knowingly receives, buys, and possesses such

information, knowing the same to have been stolen and appropriated, obtained, and converted without authorization, in violation of Title 18, United States Code, Section 1832(a)(3).

## WAYS, MANNER AND MEANS OF THE CONSPIRACY

20. Defendants SHI, BO, LIU, OGOE, UCHE, HUI, RANDALL, and others both known and unknown to the grand jury, would and did carry out the conspiracy and effect its unlawful objects, that is, the stealing, appropriation, taking, carrying away, and concealing, and by fraud, artifice and deception; the copying, duplication, photographing, downloading, uploading, altering, photocopying, replicating, transmitting, delivering, sending, mailing, communicating, and conveying; and receiving, buying, and possessing the trade secrets owned by Company A, through the following manner and means, among others:

    a) It was part of the conspiracy that members of the conspiracy, both known and unknown to the grand jury, targeted current and former Company A employees for hiring for the purpose of advancing CBMF's capability to manufacture syntactic foam without having to make a corresponding investment in R&D.

    b) It was part of the conspiracy that Defendants SHI, BO, LIU, OGOE, UCHE, HUI, RANDALL, and others both known and unknown to the grand jury, planned to steal the confidential and proprietary information of Company A, including its trade secrets, by accessing information taken by current and former Company A employees and transferring the trade secrets to CBMI in China.

    c) It was further part of the conspiracy that Defendants SHI, BO, LIU, OGOE, UCHE, HUI, RANDALL, and others both known and unknown to the grand jury, would

    acquire Company A trade secrets and use them to promote CBMI and CBMF's own syntactic foam and sphere capabilities, including development of a functional syntactic foam manufacturing facility in China without a corresponding investment in R&D.

d) It was further part of the conspiracy that members of the conspiracy, both known and unknown to the grand jury, arranged for the transfer of $2.2 million from CBMF to CBMI to maintain CBMI's operations and pay CBMI employee salaries because CBMI did not have significant income from any other source.

e) It was further part of the conspiracy that Defendants SHI, BO, LIU, OGOE, UCHE, HUI, RANDALL, and others both known and unknown to the grand jury, understood that OGOE and LIU had executed severance agreements with Company A in which OGOE and LIU had acknowledged the importance of proprietary information to Company A and agreed not to share any trade secrets of Company A, and that the conspirators took steps to avoid Company A's detection of any violation of those agreements.

## OVERT ACTS

21. In furtherance of the conspiracy, and to achieve the objects and purposes thereof, the Defendants SHI, BO, LIU, OGOE, UCHE, HUI, RANDALL, and others both known and unknown to the grand jury, committed and caused to be committed the following overt acts, among others, in the District of Columbia and elsewhere:

a) Beginning on June 27, 2014, and continuing through at least July 1, 2016, employees of CBMF sent Houston, Texas-based CBMI approximately 23 wire transfers totaling approximately $2.2 million dollars. CBMF sent these wire transfers from its account at

the Bank of China to CBMI's U.S.-based account at Bank of America, ending in 6528.

b) On January 13, 2015, RANDALL, from his personal email account, emailed OGOE at OGOE's CBMI account the following information: "Sam Please see attach for helpful info." Attached to the email were seven files. One of the attachments was Trade Secret 1, and one of the tabs included Company A's logo and name.

c) In or about January 2015, UCHE, from his Company A email account, sent Trade Secret 2 to his personal email account.

d) On or about January 14, 2015, UCHE, from his personal email account, emailed OGOE at OGOE's CMBI email account Trade Secret 2.

e) In or about January 2015, OGOE removed Company A's logo and name from Trade Secret 1.

f) On or about January 28, 2015, OGOE sent the revised Trade Secret 1 to SHI.

g) On or about January 30, 2015, UCHE sent an email from his personal email account to OGOE at OGOE's CBMI email account with the subject "Test procedure." Attached to the email was Trade Secret 3.

h) On or about March 20, 2015, OGOE emailed SHI, BO, and another CBMI employee, stating the 10mm carbon coated sphere densities for the hydrostatic burst pressure test in China were attached. OGOE also noted the pressure test procedure was attached for their review prior to sending them to China. The email had two attachments, including a Word document titled "Hydrostatic Burst Pressure Test Procedure," and a spreadsheet titled "Sam-10 mm Carbon Density 3-20-15." The word document contained a summarized version of the contents of Trade Secret 3.

i) On or about March 21, 2015, BO forwarded OGOE's March 20, 2015 email, which contained a summarized version of the contents of Trade Secret 3, to HUANG at CBMF in China.

j) On or about March 23, 2015, SHI sent an email titled "Hydrostatic Burst Pressure Test Procedure" to HUANG at CBMF in China and copied BO and U.S. Person 3. The email attached two documents titled "Hydrostatic Burst Pressure Test Procedure 10mm OD" and "Hydrostatic Burst Pressure Test Procedure 4mm OD." The attachments were substantially similar to the Word document transmitted by OGOE on March 20, 2015, which contained a summarized version of Trade Secret 3.

k) On or about March 26, 2015, HUANG responded to the March 21, 2015 email, which contained the summarized version of Trade Secret 3, by emailing BO and stating, "Attached is the pressure testing report for 10mm carbon coated spheres."

l) On or about March 26, 2015, BO forwarded HUANG's March 26, 2015 email, sent in the same email chain containing the summarized version of Trade Secret 3, to OGOE.

m) On or about April 21, 2015, HUANG sent an email to SHI and BO with the results of testing 100 microspheres, stating only 20 of the microspheres passed the test and asked to know the pressure requirements that should be applied in the test.

n) On or about July 5, 2015, U.S. Person 3 sent an email to SHI and copied HUANG and LIU. The email was titled "Re: Deep water drilling riser buoyancy module product research and development program." The email attached a document laying out CBMF's strategy regarding drill riser buoyancy module (DRBM) R&D and noted the company's goal to support the development of marine equipment for the PRC's next

"Five-Year Plan." The document announced in part that CBMF has planned to design a set of a large deepwater hydrostatic pressure test system that matched the international advanced technology level within one year.

o) On or about April 10, 2015, SHI, who owned another company, Offshore Drilling, Inc. ("ODI"), sent an email to his ODI email account. The subject of the email was "Confirm: Interview with Shan SHI at [U.S. Company D], 04/09 (Thur) 10:30 am." The email contained a forward of a message from LIU, who had recently been laid off by Company A, to SHI's U.S. Company D email account. In the original message, LIU introduced himself and explained a friend referred him to U.S. Company D and SHI. LIU asked to confirm the date/time of his interview at U.S. Company D. The email contained LIU's resume, which outlined LIU's employment at Company A.

p) On or about April 12, 2015, SHI, from his ODI email account, emailed LIU to offer a full time job at ODI, in part, in order to mask LIU's involvement with CBMI from Compnay A.

q) On or about April 12, 2015, LIU accepted the offer to work at ODI.

r) On or about April 14, 2015, HUANG tasked SHI and BO via email regarding the manufacture of syntactic foam. The email, in part, stated, "I need information regarding formula, preparation process and performance of the syntactic materials."

s) On or about April 15, 2015, LIU, from his ODI email account, emailed Trade Secret 4 to SHI at SHI's CMBI account.

t) On or about April 16, 2015, SHI, in response to LIU's April 15, 2015 email, emailed LIU at LIU's ODI email account, asking that LIU "verify the attached material."

13

u) On or about April 17, 2015, LIU, from his ODI email account, in response to SHI's April 16, 2015 email, emailed SHI Trade Secret 5.

v) On or about May 8, 2015, LIU, from his ODI email account, emailed SHI, BO, and HUANG Trade Secret 6.

w) On or about June 4, 2015, LIU emailed HUANG Trade Secret 7, stating, "The attachment provides technical data of the raw materials and prices of part of the raw material received by [Company A] for your reference."

x) On or about June 20, 2016, an identified U.S. Person emailed CBMI's accountant and instructed the accountant to "stop Gang LIU's ODI payroll from June 1 [2016]" because LIU was transferred to CBMI's system.

y) On or about August 21, 2015, HUANG emailed SHI and U.S. Person 3 questions regarding a sphere [syntactic foam component] patent application [in China]. HUANG suggested three options regarding the inventor. HUANG stated that although the technical portion of the sphere originated from LIU, the patent office thought LIU was not an appropriate choice because he was still in the non-compete clause period with Company A; therefore, it was against the law. HUANG stated someone needed to explain this to LIU. The second choice would be SHI or U.S. Person 3, and since they had no official contract with Company A, the risk was manageable. The third choice would be HUANG as a representative of Chinese staff.

z) On or about September 16, 2015, OGOE traveled to China.

aa) On or about October 1, 2015, OGOE sent an email to BO titled "Greetings from CBM Future Factory." OGOE asked how his colleagues in the United States were doing and

stated, "We are at the factory gladly working to get the task accomplished."

bb) On or about October 17, 2016, SHI called an identified U.S. Person about CBMF. SHI explained he had a factory in China that produces buoyancy material. SHI stated the business was doing very well, and the competitors had died off. SHI stated they were becoming a bigger company and said, "We standout and everybody come to see us now to try to get cheap product." SHI also stated he hired a whole bunch of people in the United States that "really know how [to develop buoyancy material]."

cc) On or about October 24, 2016, PRC Person 1 emailed SHI asking him to strengthen ties with Company A. PRC Person 1 told SHI to find out whether CBMF could sell the Company A foam balls and the micro spheres, and they need to know Company A's moves in order to adjust CBMF's business strategy.

dd) On or about April 18, 2017, SHI called U.S. Person 3. SHI explained that HUANG stated PRC Person 1 argued with the bank and others regarding the availability of funds. Afterward, SHI said, the balance was immediately increased to four million (unspecified currency). SHI told U.S. Person 3 that 40,000 (unspecified currency) had been mailed. U.S. Person 3 responded they had seen it.

ee) On or about May 15, 2017, LIU provided to BO a list of projects that CBMI had previously completed, including Autonomous Underwater Vehicle research for SOE 1, and unspecified syntactic foam projects for SOEs 2 and 3.

ff) On or about May 15, 2017, BO, SHI, and LIU submitted a CBMI bid on a contract for the next generation of commercial Remote Operated Vehicles (ROV) for U.S. Company E. CBMI's bid included the previously referenced list of projects that CBMI

had completed. The ROVs had to attain depths of 4,000-6,000 meters and utilize low density syntactic foam technology.

gg) On or about May 23, 2017, SHI, LIU, and U.S. Person 4 traveled to Washington, D.C. in order to present CBMI's bid.

hh) On or about May 23, 2017, in the District of Columbia, SHI, LIU and U.S. Person 4 provided a briefing of CBMI and CBMF's capabilities to U.S. Company F, as part of their bid for the U.S. Company E project.

ii) On or about May 23, 2017, during the briefing, LIU and SHI discussed CBMF and CBMI's previous projects. LIU stated the project closest to the specifications requested by Company E was a deepwater project for SOE 3 which involved providing syntactic foam.

jj) On or about May 23, 2017, in the District of Columbia, during the powerpoint presentation of previous projects, LIU noted a photo of steel buoys containing syntactic foam produced by CBMF. LIU stated "I don't know if we can put it there [in the powerpoint], it's military use." When asked to clarify if LIU meant the Chinese military, LIU laughed and said "skip it." SHI stated "We try not to work for the military."

(**Conspiracy to Commit Theft of Trade Secrets**, pursuant to Title 18, United States Code, Section 1832(a)(5))

**FORFEITURE ALLEGATION**

1.   Upon conviction of the offense alleged in Count One, the defendant shall forfeit to the United States: (a) any article, the making or trafficking of which is prohibited by 18 U.S.C. § 1832; (b) any property used, or intended to be used, in any manner or part to commit or facilitate the commission of the offense alleged in Count One; and (c) any property constituting or derived from any proceeds obtained directly or indirectly as a result of the commission of the offense alleged in Count One, pursuant to 18 U.S.C. § 2323; and (d) any property, real or personal, which constitutes or is derived from proceeds traceable to this offense, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). The United States will also seek a forfeiture money judgment against the defendant of at least $3,100,000.

2.   The Grand Jury finds by probable cause that the following specific properties are subject to forfeiture upon conviction of the offense alleged in Count One:

> a. real property located at 7 Buckingham Court, Houston, Texas, with all appurtenances, improvements, and attachments thereon, and is more fully described as: Lot 7, of Buckingham Court, a subdivision in Harris County, Texas, according to the map and plat thereof, recorded in Film Code No. 347064 of the map records of Harris County, Texas;
>
> b. real property located at 13601 Farm To Market 529, Houston, Texas, with all appurtenances, improvements, and attachments thereon, and is more fully described as – a tract of land containing 2.5727 acres of land (112,067 sq.ft.) out of the Charles Scarbrough survey, Abstract No. 718, being a portion of a 4.000 acre tract of land as recorded under Harris County Clerk's file No. (CCFN)

      20100135228 of the official public records of Harris County, Texas;

    c. any and all funds in Bank of America account 586035464818;

    d. any and all funds in Bank of America account 586033253050; and

    e. any and all funds in Bank of America account 586033316528.

3.    If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the Court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property that cannot be divided without difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to 21 U.S.C. § 853(p).

(**Criminal Forfeiture**, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 2323; Title 21, United States Code, Section 853(p); and Title 28, United States Code, Section 2461(c).)

A TRUE BILL

FOREPERSON

*Channing D. Phillips*/PHC
Attorney of the United States in
and for the District of Columbia