UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>**SHAN SHI**, *et al.*,<br><br>Defendants. | Case No. 17-cr-110 (CRC) |

### MEMORANDUM OPINION

Defendant Shan Shi is charged with conspiracies to commit economic espionage, trade secret theft, and money laundering. His trial is scheduled to begin on July 8, 2019. Before the Court is Dr. Shi's motion to exclude the testimony of the government's designated expert Peter Mattis as irrelevant and unduly prejudicial. See Mot. to Exclude ("Mot."), ECF No. 171. Mr. Mattis is an "expert in international affairs with a focus on China and China's intelligence collection for government and industry use." Rule 16(a)(1)(G) Expert Notice ("Expert Notice"), ECF No. 148-1, at 1. The government says his expected testimony is directly relevant to Count 2 of the Superseding Indictment charging conspiracy to commit economic espionage. One element of that offense is that the alleged conspirators agreed to steal trade secrets "intending or knowing that the offense [would] benefit any foreign government, foreign instrumentality, or foreign agent." 18 U.S.C. § 1831(a).

The Superseding Indictment alleges that Shi and his co-conspirators conspired to steal trade secrets regarding "syntactic foam"—a manufactured material frequently used in underwater buoyancy applications—with the intention or knowledge that the theft would benefit state-owned entities ("SOEs") of the People's Republic of China ("PRC"). Superseding Indictment, ECF No. 110, ¶ 27. Mattis is expected to testify about these SOEs and their relationship to the PRC, including how the PRC uses SOEs to further national goals set forth in so-called "Five-Year

Plans." Expert Notice at 2–3. The government argues this testimony goes to whether these SOEs constitute foreign instrumentalities for purposes of economic espionage and the extent to which a benefit to an SOE constitutes a benefit to the PRC.

The Court held a hearing on the motion to exclude on May 24, 2019. For the reasons that follow, the Court will deny Shi's motion.

**I.     Background**

The Superseding Indictment charges Shi and his alleged co-conspirators with three conspiracy counts: to steal and convert trade secrets in violation of 18 U.S.C. § 1832 (Count 1); to commit economic espionage in violation of 18 U.S.C. § 1831 (Count 2); and to launder monetary instruments in violation of 18 U.S.C. § 1956(h) (Count 3).

The three counts involve an alleged agreement to steal trade secrets related to "syntactic foam"—a buoyant product that "consists of tiny hollow spheres suspended in an epoxy resin" which "may be tailored for both commercial (including drill riser buoyancy modules ('DRBM') in oil exploration) and military use (including aerospace, underwater, and stealth technology)." Superseding Indictment ¶ 19. Both parties agree that there are two kinds of syntactic foam: pure (made up of microspheres) and composite (made up of both microspheres and slightly larger macrospheres). Id.; Mot. at 1–2; Opp'n, ECF No. 174, at 4. They dispute, however, (1) whether the seven alleged trade secrets at issue involve only composite syntactic foam and (2) whether composite syntactic foam also has relevant military applications.

According to the Superseding Indictment, Shi's co-conspirators include CBMF, a China-based company in which Shi held an ownership interest, and its subsidiary CBMI, a Houston-based company run by Shi to develop syntactic foam. Superseding Indictment ¶¶ 7–9, 24, 37(A). The Superseding Indictment alleges that "CBMF was tasked pursuant to the PRC's Twelfth

2

Five-Year Plan to develop the PRC's marine engineering equipment manufacturing capability, including [] underwater equipment . . . , for the benefit of the PRC." Id. ¶ 18. "In furtherance of this PRC goal, CBMF stole the trade secrets" of Trelleborg Offshore US, Inc.—a competitor in the syntactic-foam market and the alleged victim in this case—"in order to create a manufacturing facility in China for . . . syntactic foam." Id. The alleged conspirators did this, the government charges, by targeting current and former Trelleborg employees "for hiring for the purpose of advancing CBMF's capability to manufacture syntactic foam." Id. ¶ 37(B).

The Superseding Indictment also alleges that "CBMF was part of a 'National Team of Marine Engineering' and a collaborative innovation center with PRC-government entities, including SOEs [Harbin Engineering University ("HEU")], [the China Shipbuilding Industry Corporation ("CSIC")], and [the China National Offshore Oil Company ("CNOOC")]," which intended "to carry out joint ventures in developing deep-sea buoyancy material, military insulation material, and new lightweight composite design to advance PRC military and civilian interests." Id. ¶¶ 20–21. The Superseding Indictment describes a variety of marketing materials used by CBMF, discussed more fully below, as well as various bids the two companies made to entities including the alleged SOEs listed above. Finally, the Superseding Indictment refers to a list shared among alleged co-conspirators in 2017 outlining prior CBMI projects, "including Autonomous Underwater Vehicle ('AUV') research for HEU, and other syntactic foam projects for CSIC and CNOOC." Id. ¶ 38(QQ).

II.   **Analysis**

   A.  Relevance

"Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." Fed.

R. Evid. 401. Again, the government contends that Mattis's expected testimony is directly relevant to the "benefit any foreign government [or] foreign instrumentality" element of Count 2 of the Superseding Indictment. Opp'n at 2. Shi contests the relevance of this testimony on a variety of grounds, none of which is persuasive. The Court will therefore deny Shi's motion to exclude Mattis's testimony on the basis of relevance.

      1.  *Economic Espionage*

Before discussing the parties' relevancy arguments, it is helpful to unpack the "intent-to-benefit" element of economic espionage.

The Economic Espionage Act ("EEA") criminalizes two categories of corporate espionage: economic espionage, as defined by 18 U.S.C. § 1831, and theft of trade secrets, as defined by § 1832. Shi and his co-conspirators have been charged with conspiracy to commit both. To satisfy its burden on the economic espionage charge in Count 2, the government will need to prove that the conspirators agreed to steal trade secrets "intending or knowing that the offense [would] benefit any foreign government, foreign instrumentality, or foreign agent." 18 U.S.C. § 1831(a). This "intent-to-benefit" element has three related parts: the benefit, the defendant's intent, and the beneficiary.

*The benefit.* The legislative history emphasizes that the term "'benefit' [in Section 1831] is intended to be interpreted broadly." H.R. Rep. No. 104-788, at 11 (1996). According to that House Report, "benefit means not only an economic benefit but also reputational, strategic, or tactical benefit." Id. In other words, Congress intended that "the government need only prove that the actor intended that his actions in . . . controlling the trade secret would benefit the

foreign government, instrumentality, or agent *in any way*." Id. (emphasis added).[1] Although a typical "'benefit' that a foreign government enjoys as a consequence of espionage is gaining access to the stolen information," the intent-to-benefit element can be satisfied where "the defendant takes the information to a foreign country" either "to give it *or* use it for the foreign government." See United States v. Lee, No. 06-cr-0424, 2010 WL 8696087, at *6 (N.D. Cal. May 21, 2010) (emphasis added).

*The beneficiary.* As relevant here, a defendant must intend or know that the offense will benefit a foreign government or its instrumentality.[2] The EEA defines "foreign instrumentality" as "any agency, bureau, ministry, component, institution, association, or any legal, commercial, or business organization, corporation, firm, or entity that is substantially owned, controlled, sponsored, commanded, managed, or dominated by a foreign government." 18 U.S.C. § 1839(2). According to the legislative history, "substantial" "means 'material or significant.'" 142 Cong. Rec. S12,201-03, S12,212 (daily ed. Oct. 2, 1996) (Managers' Statement for H.R. 3723). The inquiry is not a "mathematical" one, however, limited only to the percentage ownership by a foreign government. Id. (explaining that the "simple fact" that a foreign government owns either the "majority" or just "10 percent of a company" will not be dispositive). "Rather[,] the pertinent inquiry is whether the activities of the company are, from a practical and substantive standpoint, foreign government directed." Id.

---

[1] This represents a key difference between economic espionage under section 1831 and trade secret theft under section 1832, which requires "*economic* benefit" specifically. 18 U.S.C. § 1832(a) (emphasis added).

[2] The government does not allege that Shi knew or intended that the theft of trade secrets would benefit an agent of the PRC.

This definition reflects another key difference between section 1831 and section 1832: the former (economic espionage) penalizes conferring a benefit on a foreign government or its instrumentalities while the latter (trade secret theft) penalizes conferring a benefit on anyone who is not the rightful owner of the trade secret. For this reason, section 1831 does not apply "to foreign corporations" as beneficiaries "when there is no evidence of foreign government sponsored or coordinated intelligence activity." Id.; see also Lee, 2010 WL 8696087, at *5 (quoting 142 Cong. Rec. at S12,212); Office of Legal Educ., Dep't of Justice, Prosecuting Intellectual Property Crimes at 183 (4th ed. 2013)[3] ("DOJ Manual") (quoting same). The legislative history explains that "[t]his particular concern"—that not all foreign corporations be swept in under section 1831—"is borne out in [Congress's] understanding of the definition of 'foreign instrumentality.'" 142 Cong. Rec. at S12,212. That is, when a foreign corporation benefits from the theft of trade secrets, there must be evidence of foreign government sponsorship or coordination for the corporation to be considered a foreign instrumentality and the offense to constitute economic espionage under section 1831.

*The defendant's intent.* Again, the "principle purpose" of section 1831 "is not to punish conventional commercial theft and misappropriation of trade secrets[,] which is covered by" section 1832. Id. Section 1831, therefore, "does not penalize a defendant's intent to personally benefit or an intent to bestow benefits on the economy of a country that might be realized from operating a company in a foreign country." Lee, 2010 WL 8696087, at *6; see also id. at *7 ("Evidence that Defendants solely intended to benefit themselves in [a foreign county], or benefit a private corporation in [that country] is insufficient for the charge of Economic Espionage.").

---

[3] Available at https://www.justice.gov/sites/default/files/criminal-ccips/legacy/2015/03/26/prosecuting_ip_crimes_manual_2013.pdf.

In other words, merely doing business in a foreign country is not enough.  So, as Shi emphasizes, "[t]he government must present evidence that Defendants intended to confer a benefit *on* the PRC, not receive a benefit *from* it."  Reply, ECF No. 181, at 10 (quoting Lee, 2010 WL 8696087, at *8).

        2. *Relevancy arguments*

Moving, then, to the relevance of Mr. Mattis's expected testimony.  The government's theory of liability is that Dr. Shi and his co-conspirators conspired to steal trade secrets regarding syntactic foam "with the intention or knowledge that the theft would benefit numerous state-owned entities (occasionally referred to as 'SOEs') of the PRC."  Opp'n at 1 (citing Superseding Indictment ¶ 27).  To prevail under this theory, the government will need to present evidence that these SOEs are foreign instrumentalities within the meaning of the EEA.  The government will also need to present evidence that the conspirators intended to benefit the PRC or its instrumentalities, not merely to profit for themselves.  Mattis's expected testimony goes to both points.  Shi offers three main reasons why this expected testimony is not relevant, but these reasons reflect either misunderstandings of the intent-to-benefit element or the evidence as alleged.

        a.   Intent to benefit "economic espionage"

Dr. Shi first contends that economic espionage requires predicate evidence of either (1) solicitation by the foreign government or its instrumentalities or (2) a direct transfer of information to those beneficiaries.  But section 1831 requires neither.

**Solicitation.**  Shi argues that Mattis's testimony is irrelevant because neither Mattis nor the Superseding Indictment offers any "evidence of foreign government sponsored or coordinated intelligence activity."  Reply at 18.  He relies on the EEA's legislative history, the

Department of Justice Manual, and case law to argue that in addition to the defendants' intent to confer a benefit on the PRC or its instrumentalities, the government must prove that the PRC or its instrumentalities sponsored, solicited, or otherwise requested the economic espionage. See Reply at 6–9, 13, 20–21.  But the intent-to-benefit element is *not* a two-way street.  Dr. Shi misinterprets these sources to improperly import to that element a requirement of foreign government involvement that is instead specific to whether the entity receiving the benefit is a foreign instrumentality.

True, economic espionage requires "foreign government activity."  Dep't of Justice, Criminal Resource Manual § 1133.[4]  As other courts have explained, "[section] 1831 is designed to apply only when there is 'evidence of foreign government sponsored or coordinated intelligence activity.'"  Reply at 6 (quoting United States v. Liew, 856 F.3d 585, 597 (9th Cir. 2017); United States v. Hsu, 155 F.3d 189, 195 (3d Cir. 1998) (both quoting 142 Cong. Rec. at S12,212)).  But as described above, supra 5–6, this language goes to the *type of beneficiary* at issue—that is, if the beneficiary of the corporate espionage is not a government entity per se, there must be sufficient evidence of government control for that beneficiary to be considered a foreign instrumentality for purposes of the EEA.  The defense takes this language out of context to suggest that it imposes an additional requirement that the foreign government have solicited the defendant.  The sources on which Shi relies bear the Court's interpretation out.

For instance, Shi quotes the DOJ Manual as follows: "If this 'entity' is not a [foreign] government entity per se, such as a business, there must be 'evidence of foreign government sponsored or coordinated intelligence activity' with the entity."  Reply at 7 (quoting DOJ Manual

---

[4] Available at https://www.justice.gov/jm/criminal-resource-manual-1133-18-usc-1832-element-four-defendant-acted-intent-economically.

at 183 (quoting 142 Cong. Rec. 27,116 (1996))).  But Shi overlooks the reference to the "entity" in the first clause and instead focus only on the second clause.  Taken in context, the reference to "this entity" makes clear that the Manual is referring to the requirements of a foreign instrumentality: the paragraph that includes the quoted material begins with the statutory definition of a foreign instrumentality, which includes an "*entity* that is substantially [] controlled, sponsored, [etc.] by a foreign government."  DOJ Manual at 182 (emphasis added).

The cases on which Shi relies also demonstrate that there is not a separate requirement that the foreign government have solicited or sponsored the defendant for economic espionage.  First, the defense offers United States v. Chung, 659 F.3d 815 (9th Cir. 2011), as the paradigmatic example of economic espionage.  See Reply at 7.  In that case, the government offered sufficient evidence of the defendant's intent to benefit the PRC by showing that he "provid[ed] technical information responsive to requests from Chinese officials"; "deliver[ed] presentations to Chinese engineers"; and possessed thousands of technical documents.  Chung, 659 F.3d at 828.  To be sure, there was evidence that the defendant was acting in response to requests by a foreign government, but the PRC's role in the theft of trade secrets was *not* dispositive.  The defendant was convicted of both acting as an unregistered foreign agent and economic espionage.  Id. at 818.  The Ninth Circuit explained that "[u]nlike the foreign agent count, which required evidence of a foreign government's direction or control, criminal liability under the EEA may be established on the basis of Defendant's intent alone."  Id. at 828.  The DOJ Manual on which Shi so heavily relies cites Chung to explain that "there is no requirement to show the government's role to obtain the trade secret (even where such proof may be present)."  DOJ Manual at 182.  "Consequently, normally evidence regarding the conduct or

9

intent of the foreign government or its officials is not a requirement to establish a violation under § 1831." Id.

Lee, another case on which the defense relies, see Reply at 8–10, confirms that the intent-to-benefit element does not contain an additional coordination requirement. Unlike in Chung, "there was no evidence [in Lee] that either [d]efendant was an agent of the PRC" or "that any of [d]efendants' conduct was solicited, sponsored, [or] coordinated by a representative of the PRC" such that they "*knew* that the information would confer a benefit on the PRC." Lee, 2010 WL 8696087, at *7 (emphasis added). Even so, because section 1831 penalizes "intending" in addition to "knowing" that the offense would benefit a foreign government, the Lee court reasoned that "the government would have met its burden if it presented evidence showing that Defendants were 'intending' to transfer the [] trade secrets to the PRC or one of its instrumentalities or agents, *or use it for the PRC's benefit even if the transfer or beneficial use was not solicited by the PRC*." Id. (emphasis added).[5]

Thus, contrary to Shi's interpretation, economic espionage does not require evidence that the foreign government solicited a defendant to steal trade secrets.[6] The Court therefore rejects his argument that Mattis's expected testimony is not relevant because it "fails to establish any

---

[5] The government failed to meet its burden, however. Shi argues that "what was fatal to the government's case" in Lee was the lack of evidence about solicitation or sponsorship. Reply at 10. This is not correct. As just explained, the government could have satisfied the intent-to-benefit element by offering evidence of an intent to use the stolen information for the benefit of the foreign government even if that government did not solicit the information.

[6] To be clear, the government will still need to prove that Shi intended to benefit the PRC or its instrumentalities. Mattis's expected testimony goes to this point: he is expected to testify about the level of control the PRC exercises over the SOEs referenced in the evidence—some of which appear to be foreign corporations—as proof that these SOEs are foreign instrumentalities for purposes of economic espionage.

10

connection between the alleged misappropriation of trade secrets and requests by the Chinese government (or SOEs) for the trade secrets." Reply at 13.

***Direct Transfer.***  Dr. Shi argues that if evidence of solicitation is absent, the government must offer proof that the defendants directly transferred the alleged trade secrets to the PRC or its SOEs.  He contends that to qualify as a "benefit" for purposes of economic espionage, the foreign government, instrumentality, or agent must have "*direct* access to the stolen information."  Reply at 9 (emphasis added).  But here, Dr. Shi says, there are no allegations that the conspirators *directly transferred* stolen information to SOEs or the PRC itself; rather, the Superseding Indictment alleges that they provided that information to CBMF and CBMI, which is only "tangentially related" to the SOEs about which Mattis will testify.  Id. at 11.  This argument misses the mark for two reasons.

First and foremost, Dr. Shi's interpretation of the meaning of "benefit" is belied by both the case law and legislative history.  He interprets Lee to stand for the proposition that "the 'benefit' contemplates direct access to the stolen information by the foreign government, instrumentality, or agent."  Reply at 9 (citing Lee, 2010 WL 8696087, at *6).  The district court in Lee explained that "[a]n inherent feature of espionage is that the information is turned over to the foreign government or to an agent of the foreign government."  Lee, 2010 WL 8696087, at *6.  But the court then proceeded to recognize a more expansive view of espionage, reasoning that "[e]spionage is not committed if a defendant takes the information to a foreign country with no intent to give it *or use* it for the foreign government."  Id. (emphasis added).  The court later repeated that the intent-to-benefit element can be satisfied with evidence that the defendant "acted intending to turn over possession of the trade secret to *or use* the trade secret on the behalf or for the benefit of an agent or instrumentality of the PRC."  Id. at *7 (emphasis added).  Thus,

11

under Lee, a defendant can confer a "benefit" on a foreign government or its instrumentality either through "transfer" or "beneficial use," implying that the latter does not require direct access to the information.[7]

This is consistent with the legislative history, which, as explained above, instructs that the term "'benefit' is intended to be interpreted broadly" to include "not only an economic benefit but also reputational, strategic, or tactical benefit." H.R. Rep. 104-788, at *11. The Court has been unable to find, and Shi has not provided, any clues in the legislative history to suggest that the foreign government must actually possess the stolen information to benefit from it.

Second, the Superseding Indictment does in fact allege information sharing, which may prove to show either direct access or beneficial use: "CBMF was part of a 'National Team of Marine Engineering' and a collaborative innovation center with PRC-government entities, including SOEs HEU, CSIC, and CNOOC," created in order "to carry out joint ventures in developing deep-sea buoyancy material, military insulation material, and new lightweight composite design to advance PRC military and civilian interests." Superseding Indictment ¶¶ 20–21; see also id. ¶ 38(HH) (alleging that Shi "touted CBMF to [Trelleborg] as a high profile collaboration with the PRC Government"); id. ¶ 38(JJ) (alleging that Shi stated to Trelleborg "that CBMF was a high profile project *for* the PRC Government, that the PRC Government had invested a lot in CBMF, and that China would not allow CBMF to fail" (emphasis added)).

---

[7] Lest there be doubt, the Lee court did not confine the "beneficial use" conception of "benefit" to cases in which there is evidence of government solicitation of the stolen information. See id. (recognizing that "the government would have met its burden if it presented evidence showing," among other things, that the defendants intended to "use [the information] for the PRC's benefit even if the transfer or beneficial use was not solicited by the PRC").

12

Dr. Shi's direct-transfer argument really boils down to his assertion that the government's theory of liability rests on "a flawed legal premise": that a private company marketing a lawful product to a foreign government, among others, can be guilty of economic espionage. Reply at 2. Defense counsel echoed the point at the hearing, arguing that an arm's-length commercial transaction with a foreign government similarly would not be economic espionage. This is another way of saying that merely doing business in a foreign country, including with a foreign government, is not enough. That's correct: there must be some intent or knowledge that the stolen information will benefit that country's government or its instrumentalities. But, contrary to Dr. Shi's assertions, the Superseding Indictment and other evidence does suggest an intent to benefit the PRC or its SOEs.

The government details much of this evidence in its opposition. As evidence that "Shi understood that the technology would be used to benefit China," the government cites a July 2015 email sent from an unindicted co-conspirator, Lei Jiang, to the alleged conspirators regarding CBMF. Opp'n at 5 (citing Doc. No. 267298231E, attached to Shi's Reply as Ex. B, ECF No. 181-2). The email attaches a CBMF draft proposal. This proposal describes CBMF as "the only company collaborating with China National Offshore Oil Corporation [CNOOC] in the development of [deep water buoyancy material]." Ex. B (Doc. No. 267298231E) at 3. It also says that CBMF's products have already "been put into use in the CNOOC's projects." Id. Dr. Shi counters that this proposal is really a run-of-the-mill corporate document based on references to goals like breaking up the monopoly on the technology in question by foreign nations. Reply at 5. But other aspects of this proposal hint at a broader goal to further the PRC's national ambitions. For example, the proposal indicates that launching research and development in deep-water buoyancy material will "make a contribution for China to realize its dream of a

marine superpower." Ex. B at 3; see also id. at 4 (explaining that the current state of DRBM in China is "not conducive to the development of marine engineering equipment in the next Five-Year Plan of China"); Ex. E to Reply, ECF No. 181-5, at 2 (CBMF company fact sheet explaining that "[m]arine engineering has been listed as one of the important industries" in the 11th, 12th, and 13th Five-Year Plans). In addition, as explained above, the Superseding Indictment alleges that CBMF was part of a National Team of Marine Engineering and collaborative innovation center with SOEs in order "to carry out joint ventures in developing deep-sea buoyancy material, military insulation material, and new lightweight composite design to advance PRC military and civilian interests." Superseding Indictment ¶¶ 20–21; see also id. ¶ 37(G) (alleging that "Shi and others . . . coordinated the development and manufacture of syntactic foam in order to benefit PRC's SOEs, including HEU, CNOOC, and CSIC, and Linhai City, by providing the technology and materials necessary to fulfill the PRC's goals").

The Court declines at this stage to resolve the parties' factual disputes about what this evidence shows. At trial, it will not be enough for the government to show that the conspirators simply intended to enrich themselves by doing business in the PRC; rather, it will need to present sufficient evidence upon which a rational trier of fact could find that Defendants acted either intending to turn the trade secrets over to, or use the trade secrets on behalf of or for the benefit of, the PRC or one of its instrumentalities. Mattis's expected testimony is relevant to that question because it will put the above-cited evidence in context, including the references to the PRC's Five-Year Plans as they relate to becoming a marine superpower.[8]

---

[8] For similar reasons, the Court declines Shi's invitation to follow United States v. Pangang Grp, Co., 879 F. Supp. 2d 1052 (N.D. Cal. 2012), which he says "is directly on-point." Reply at 13. In that case, the court struck as irrelevant portions of a declaration offered by the government regarding "the structure of corporations in the PRC, in general" and not the

      b.  SOEs as foreign instrumentalities

Dr. Shi initially asserted that Mattis's testimony regarding SOEs is irrelevant because "[p]roviding a benefit to an SOE (such as [the State-Owned Assets Supervision and Administration Commission ("SASAC")]) does not demonstrate an intent to benefit the PRC." Mot. at 7. But he appears to have recognized that this assertion overlooks that the EEA criminalizes economic espionage for the benefit of foreign instrumentalities. Reply at 1 n.1. And as explained above, the government's theory of liability is that Shi and others conspired to steal syntactic foam information in order to benefit SOEs *as foreign instrumentalities*. Mattis's expected testimony is directly relevant because it "will help the jury decide whether the referenced state-owned entities are instrumentalities of the PRC." Opp'n at 10. Shi clarifies in his reply that he will not object to Mattis's testimony to the extent it describes the functions and makeup of the entities referenced in the evidence and relates to whether those entities are SOEs. Reply at 1 n.1. He emphasizes, however, that any testimony Mattis offers regarding the SOEs and "the Chinese military" is both irrelevant and inflammatory. Id. at 1. This leads the Court to Dr. Shi's final relevancy argument.

      c.  Military uses

---

"Pangang Defendants specifically." Pangang, 879 F. Supp. 2d at 1057. The issue before the court in that case was whether the government had properly served the Pangang Defendants by serving the summons on the office manager of a New Jersey-based company owned by Pangang. Even assuming this evidentiary ruling was not made in reference to the question of proper service (which depended, in part, on the relationship between Pangang and the American company), the case is neither binding nor persuasive here. As the government has explained, evidence of Shi and his alleged co-conspirators' *mens rea* will not come from Mattis's testimony; rather, he will put that evidence in context by explaining the structure of the SOEs referenced and their relationship to the PRC. Therefore, contrary to Shi's contention, see Reply at 9, Mattis's testimony need not relate to CBMF or CBMI directly to be relevant.

15

The parties dispute whether the alleged trade secrets in question involve only composite syntactic foam or also pure syntactic foam.  Compare Opp'n at 4 & 4 n.2 (asserting that trade secret 5 "relates directly to pure foam"), with Reply at 4 n.2 (citing expert declaration, attached at ECF No. 187 (sealed), concluding that trade secret 5 relates to composite syntactic foam).  This matters, Shi says, because composite syntactic foam is used for commercial oil and gas exploration and not for military applications; therefore, Mattis's testimony about the Chinese military is irrelevant and inflammatory.  Mot. at 1, 4.  The Court will not resolve this factual dispute.  Even if it were proper to do so, it need not.  First, Shi acknowledges in reply that composite syntactic foam "has some potential military uses outside of the oil and gas industry."  Reply at 4.  And second, contrary to Shi's assertion, there is at least some evidence in the record suggesting that *Dr. Shi* believed that the trade secrets in question (whether related to pure or composite syntactic foam) would have military uses and that "he was marketing to and assisting the PRC military."  Opp'n at 4, 6.  It is Dr. Shi's beliefs that matter for purposes of his *mens rea*.

The materials attached to Shi's reply repeatedly refer to the military uses of composite syntactic foam.  For example, in May 2016, he circulated to his alleged co-conspirators a CBMF PowerPoint presentation titled "Outlook on Composite Buoyant Material Product in Military Application."  Ex. F (Doc. No. 260000891E) to Reply, ECF 181-6, at 3.  As the name suggests, the presentation outlines the military and civilian applications of buoyancy material, including structural material for submarines, submarine antennae, and rescue floats.  Id. at 4–5.  The presentation also emphasizes that the foam can be used to make "composite bullet-proof materials" when combined with strong metal, id. at 6, and can be used for "anti-collision purposes" because it is shock absorbent, id. at 5.  The document includes pictures of tanks, submarines, and warships.

Other evidence likewise references the military uses of composite syntactic foam. For example, in July 2015, Shi received from an alleged co-conspirator an email with a draft "Summary of Multi-Functional Light-weighted Composite Materials" for CBMF. Ex. D (Doc. No. 266363411E) to Reply, ECF No. 181-4, at 4. The document explains that composite materials have "[o]ffshore engineering" and "[m]ilitary" applications, among others. Id.; see also Ex. E at 2 (explaining that the "developed materials may apply to civilian, industrial, and military uses"). Shi emphasizes that the fact sheet lists military applications last, behind "[a]utomotive," Reply at 6, but that will be a question of weight for the jury. Finally, CBMI meeting minutes from May 2015 list "action items," including to look into "China market developments in buoyancy material repair and in military industries" and "national projects of new bulletproof and anti collision technologies developments." Ex. C (Doc. No. 265945758E) to Reply, ECF No. 181-3, at 2, 7.

In the face of these references to the military uses of composite syntactic foam, Shi returns to a familiar argument: that any testimony about the Chinese military is not relevant because the evidence does not show any "communications between Dr. Shi (or the co-Defendants) and anyone in the Chinese military." Reply at 4. But again, economic espionage does not require this level of coordination between benefactor and beneficiary so long as the defendant intended or knew that the offense would benefit the foreign government or its instrumentalities. And Mattis's testimony will go to that point, providing context for the alleged co-conspirators' references to the military uses of composite syntactic foam by explaining that some of the SOEs referenced are military focused. For example, he is expected to explain that "HEU is a China-based SOE that has extensive ties to the Chinese People's Liberation Army and Navy" and "publicly holds itself out as a primary or leading researcher in PRC military

17

programs." Expert Notice at 2. And CSIC "develops, produces, and repairs military and commercial vessels," and "is engaged in military shipbuilding and helps the PRC in ship design and weapons development." Id. at 3. His testimony will thus be relevant to whether the conspirators intended to benefit the PRC, its instrumentalities, and/or its military by stealing trade secrets they believed to have military applications.

*   *   *

Therefore, for the reasons given above, the Court will deny Dr. Shi's motion to exclude Mattis's testimony as irrelevant under Rule 401.

B. Prejudice

Even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of . . . unfair prejudice." Fed. R. Evid. 403. "Unfair prejudice within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." United States v. Ring, 706 F.3d 460, 472 (D.C. Cir. 2013) (quoting Advisory Committee's Note, Fed. R. Evid. 403). Shi argues that Mattis's testimony lacks probative value and that the danger of unfair prejudice is extremely high because it is calculated to stoke the jury's fears about the Chinese military.

As already discussed, however, Mattis's expected testimony is probative of two facts the government will need to prove. First, he will testify about the relationship between the state-owned entities referenced in the evidence and the PRC. This will go to whether these SOEs are considered foreign instrumentalities for purposes of economic espionage. And second, Mattis will testify about how the PRC uses these SOEs to further its national goals. This will go to whether, by allegedly collaborating with the SOEs, the Defendants intended or knew that their trade secret theft would benefit the PRC or its instrumentalities.

In addition, Rule 403 "does not bar powerful, or even prejudicial evidence. Instead, the Rule focuses on the 'danger of *unfair* prejudice,' and gives the court discretion to exclude evidence only if that danger *substantially* outweigh[s]' the evidence's probative value." United States v. Pettiford, 517 F.3d 584, 590 (D.C. Cir. 2008) (emphasis in Gartmon) (quoting United States v. Gartmon, 146 F.3d 1015, 1021 (D.C. Cir. 1998)). The Court concludes that Mattis's expected testimony regarding the Chinese military is not unfairly prejudicial because the conspirators themselves refer to the military uses of the composite syntactic foam. Therefore, the Court will deny Dr. Shi's motion to exclude Mattis's testimony as it relates to the military functions of the SOEs referenced in the conspirators' communications and how those SOEs are used to advance PRC goals. Dr. Shi will be permitted to renew this challenge, however, should Mattis begin discussing threats to American national security more generally without some nexus to the Defendants or their communications.

**III.    Conclusion**

For the foregoing reasons, the Court will deny Dr. Shi's motion to exclude the testimony of government expert Peter Mattis. An Order accompanies this Memorandum Opinion.


Date: June 10, 2019

　　　　　　　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　　　　　　CHRISTOPHER R. COOPER
　　　　　　　　　　　　　　　　　　　　　　　　　　　United States District Judge