# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO.  17-110 (CRC) |
| | : | |
| v. | : | |
| | : | |
| SHAN SHI, | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

There are three primary issues to resolve prior to the Court's imposition of a sentence in this case:

1) Did the defendant know or intend that the offense would benefit a foreign government, foreign instrumentality, or foreign agent, or intend that the trade secrets would be transported or transmitted out of the United States, pursuant to United States Sentencing Guideline (U.S.S.G.) § 2B1.1(b)(14)(A) & (B)?

2) Does the defendant's leadership role in the scheme warrant an increase in the offense level, pursuant to U.S.S.G. § 3B1.1?

3) What mandatory restitution should the Court order pursuant to 18 U.S.C. § 3663A?

A district court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).  The Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark." *Id.* at 46-49.  The district court should next consider all of the applicable factors set forth in 18 U.S.C. § 3553(a).  *Id.* at 49-50.  Indeed, the Guidelines themselves are designed to

1

calculate sentences in a way that implements the considerations relevant to sentencing as articulated in § 3553(a).  *United States v. Rita*, 551 U.S. 338, 347-50 (2007).

The § 3553(a) factors include (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment; (3) the Sentencing Guidelines and related Sentencing Commission policy statements; and (4) the need to avoid unwarranted sentence disparities.  The government will first address the Guidelines calculation.

## The Guidelines Calculation

The Court has determined a loss amount of $1,050,000 for purposes of calculating the defendant's adjusted offense level.  This memo will address the other applicable U.S.S.G. provisions.

A.  <u>The Defendant Knew or Intended His Theft of Trade Secrets Would Result in Trade Secrets Sent to China, and that the Misappropriation Would Benefit the PRC</u>

The Guidelines state that if the offense involves misappropriation of a trade secret and the defendant knew or intended that the trade secret would be transported or transmitted out of the United States, the offense level should be increased by 2.  If "the offense would benefit a foreign government, foreign instrumentality, or foreign agent, increase by 4 levels[,]" whichever is greater.[1]  U.S.S.G. 2B1.1 § (b)(14)(A) & (B).  As used in the Economic Espionage Act, "benefit to a foreign government, . . . instrumentality, or . . . agent" is not limited to economic benefit, but *any* benefit (reputational, strategic, tactical, etc.).  *See* H.R. Rep. No. 104-788, at 11 (1996).  As

---

[1]    The Guidelines also state that if (B)—the benefit to a foreign entity—applies, and the resulting offense level is less than level 14, the resulting offense level should be increased to 14.

stated by this Court, "Congress intended that 'the government need only prove that the actor intended that his actions in . . . controlling the trade secret would benefit the foreign government, instrumentality, or agent *in any way.*'"  Mem. Op., ECF No. 207, at 4-5 (quoting H.R. Rep. No. 104-788) (emphasis in opinion).  There is at least a preponderance of evidence that the defendant during the scheme knew, if not intended, that the theft of the Trelleborg trade secrets would benefit the People's Republic of China ("PRC" or "China"). The Court should, applying the preponderance of evidence standard, review the defendant's "relevant conduct," and find that the defendant knew, if not intended, both that the trade secrets would be transmitted out of the United States and that the theft would benefit the PRC.  So long as the preponderance of evidence standard is met, *United States v. Bell*, 795 F.3d 88, 103 (D.C. Cir. 2015), the Court "'may consider uncharged or even acquitted conduct in calculating an appropriate sentence.'"  *United States v. Abu Khatallah*, 314 F.Supp.3d 179, 185 (D.D.C. 2018) (quoting *United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008)).  Here the defendant knew or intended both, so an increase of 4 levels is appropriate.

It was part of the scheme to both send the technology to China and to have the PRC ultimately benefit from the transfer.  These goals were written down generally before the trade secret theft, as well as specifically after the theft.  The defendant attempted to achieve those goals by developing the stolen trade secrets, patenting the information taken from Trelleborg, and offering the technology in bids to PRC-controlled institutions like the People's Liberation Army ("PLA") and the Chinese National Offshore Oil Corporation ("CNOOC").  As shown below, the defendant demonstrated his intent to benefit the PRC in a multitude of ways.[2]

---

[2]   Although the government summarized the trial record in its Opposition to the Rule 29 Motion related to the Conspiracy to Steal Trade Secrets count, the government did not at that

In its 12th Five-Year Plan, the PRC sought the development of Chinese buoyancy materials which Harbin Engineering University ("HEU"), a PRC instrumentality, recognized as deficient relative to other countries' technology.[3]   Exhibit 84 at USAO 32699, 32717.   Taizhou CBM-Future New Materials Science & Technology Co., Ltd. ("CBMF"), created in 2012, sought to produce high performance deepwater buoyancy materials with the help of the defendant.   Exhibit 2 at USAO34574.   CBMF formed an agreement with HEU for development of that material. Exhibit 84 at USAO32725.   The "National Team" of development in buoyancy materials included HEU and CNOOC; it received extensive state funding; and its research and development component was dominated by HEU employees, including the defendant.   Exhibit 2 at USAO34598-99, 34604-05; Exhibit 5 at USAO35159 (describing the defendant as a then-current Overseas Professor for HEU).

The defendant now claims that CBMF was not funded by the PRC, January 9, 2020 letter to Presentence Report Writer, but that claim is false.   The defendant acknowledged to ex-Trelleborg official Mark Angus in late 2015 that CBMF was funded in part by the Chinese government.   7/9/19 Tr. at 403.   Indeed, when Angus saw the CBMF conference room in Linhai, China, and asked why it was so large, the defendant responded that "this was too important for the Chinese government to let it fail."   7/9/19 Tr. at 404.   The defendant acknowledges, helpfully, that

_____

time provide a fulsome recitation of the evidence relating to the benefit the defendant sought to provide the PRC.  The government does so now.
[3]      According to testifying witness James Mulvenon, an expert in Chinese government, Harbin Engineering University ("HEU") was a "defense industrial university" that was close to the defense industries that make weapons for the PRC.  HEU was subordinate to the State Administration of Science Technology, Industry of National Defense ("SASTIND"), which was directly subordinate to the Ministry of Industry and Information Technology ("MIIT").  MIIT was directly subordinate to the State Council, a council of ministers within the Chinese government.  7/11/19 Tr. at 831-832.  Both HEU, MIIT, as well as CNOOC, were Chinese government-controlled entities.  *Id*. at 844.

"CBMF received funding from MIIT [Ministry of Industry and Information Technology]" January 9, 2020 letter at 1-2, and it is undisputed that MIIT is a Chinese government controlled entity. *See* Note 3. It should be undisputed that the defendant knew and understood the PRC had a significant stake in CBMF's success in developing buoyancy materials.

CBMF planned to and did establish CBM International ("CBMI"), a wholly owned subsidiary, in Houston, Texas, where the defendant lived. Exhibit 2 at USAO34574. In March 2014, CBMF agreed to provide two million of its shares to the defendant as part of a joint agreement acknowledging their mutual buoyancy material experience, though tellingly there is no evidence that the defendant had any experience with composite syntactic foam. The defendant agreed in exchange to actively bring in new technology and high-level talented people. Exhibit 12A at USAO35020. CBMF transferred to CBMI millions of dollars over the course of the conspiracy, particular during and after the transfer of the trade secrets, and it appears CBMI had no other source of income or way to pay salaries and expenses.

CBMF also agreed to assist the defendant in submitting an application relating to the "Thousand Talents Program," Exhibit 12A at USAO35021, which co-conspirator Kui Bo testified was a program that in part permitted those with "high technology" backgrounds to seek funding from the PRC. 7/17/19 Tr. at 1700. The defendant's application, dated April 28, 2014, shortly after the incorporation of CBMI, summarized the defendant's extensive engineering experience. The defendant wrote that he would build "China's first deepsea drilling buoyancy material production line" by moving to "digest/absorb the relevant, critical U.S. technology." Exhibit 338 at USAO35134.

In his application, the defendant explicitly adopted key national policies and the goals of the state-owned enterprises such as HEU. He identified areas in the South China Sea and East

China Sea as ripe for marine oil and gas production, but noted China "lacks technology and equipment with its own independent intellectual property right. The fall-behind status has severely restricted our country's development of deep sea oil and gas resources" and obstructed China's ability to develop foreign deep sea oil and gas fields. Exhibit 338 at 35133; *see also* Exhibit 84 at USAO32700, 32725 (HEU presentation describing South China Sea reserves, stating "Safeguard China's sovereignty in South China Sea is the core interest of the country;" describing formation of CBMF). The defendant admired CNOOC's HYSY 981 drilling platform located in the South China Sea as an example of the "Ocean Power" strategy of the PRC.[4]   The defendant praised HYSY-981 as "our country's first dep water drilling platform symbolizing a substantial step forward of "Deepwater Strategy" for our country's marine oil industry." Based on the defendant's experience "taking into consideration the situational reality in relation to our country's current implementation of the 'Ocean Power' strategy, *it is the right timing to return to the country for repaying with my services*. I believe that I can make corresponding contributions to the development of our country's marine engineering endeavor and the advancement of technology of related marine engineering industries." Exhibit 338 at 35133 (emphasis added). The defendant acknowledged that "Ocean Power" was "an effective part of China Dream," emphasized by General Secretary Xi Jinping. *Id.* His objective was to "participate in the state's design and R&D of marine engineering equipment and materials including . . . drill riser" and promote the industrialization of "deepsea buoyance materials," in the pursuit of "realization of the general goal

---

[4]      HYSY 981 was part of the 2014 China-Vietnam oil rig crisis, where CNOOC moved HYSY 981 to waters near islands in the South China Sea that are claimed by multiple countries, including China and Vietnam. See Washington Post Editorial, "A Beijing power play in the South China Sea is met with U.S. inaction," May 12, 2014. Shi was likely aware of the significance of this incident when he continued to move forward with his application in August 2014. Exhibit 182.

of 'Ocean Power!'" *Id.* at 35134.  The defendant clearly linked the PRC's object of developing

oil drilling with the PRC's other goals of self-sufficiency and control over its adjacent waters.

The defendant further described how he would research deep water buoyancy materials,

build "China's first deepsea drilling buoyance material production line to satisfy the needs of our

country's marine engineering development," and work jointly with state run organizations like

HEU and CNOOC for "the application for support for Science and Technology Projects under the

State Special Program" to "solve the urgent critical technical issues faced by our country's marine

engineering development."  He would further facilitate the transforming and upgrading of

"Zhejiang [Province]'s development of marine engineering economy, facilitate the transforming

and upgrading of Zehejiang's traditional economic mode, explore and expand new growth

potential for the regional economy, and make contributions to our country's marine engineering

endeavor." *Id.*[5]  In order to do these things, the defendant would have to "*digest/absorb the*

*relevant, critical U.S. technology,*" *id.* at USAO35134 (emphasis added).  He also indicated in

notes that it was critical to recruit talents from other companies, stating that "competitors are more

willing to provide detailed information." Exhibit 180 at USAO13951.  The defendant thus directly

tied acquiring the relevant technology with his goal of benefitting the PRC.

It is with this goal that the defendant then hired Sam Ogoe at a salary of $100,000 per year,

in part based on an interview in which Ogoe stated that he needed the Trelleborg data to make the

Trelleborg spheres, and that he could get it from his friends. 7/18/19 Tr. at 1803.  Ogoe was hired

in part in order to deliver commercially viable spheres to China.  For example, Ogoe stated to the

defendant on March 20, 2015 in reference to Trade Secret 3 that "[t]he 10 mm carbon coated

---

[5]     Zhejiang Province is a province of China.  It includes Taizhou city (for which CBMF is
partially named) and Linhai city (where CBMF had its factory).

spheres densities for hydrostatic burst pressure test in China are attached.  The pressure test procedure is also attached for your review prior to sending them to China." Exhibit 26.  Ogoe understood that CBMI lacked a hydrostatic test machine but that there was one at CBMF in China, so the spheres had to be shipped to China.  7/18/19 Tr. at 1811-1812.  On March 23, 2015, the defendant emailed Hui Huang, a co-conspirator and key CBMF contact in China, attaching the pressure testing procedure from Trade Secret 3, and converting the pressure per square inch description of the pressure limit, used in the United States, to the metric mega-pascal unit, or Mpa, which is used in China.  Exhibit 27.  Later during the scheme, CBMF and the defendant sent Ogoe to China.  The purpose of the trip, as Ogoe testified, was that "[w]e made spheres that we had started here, took the technology there, and we made spheres.  And we were living in that factory making the spheres." 7/18/19 Tr. at 1813.

In April 2015, Huang, from China, told the defendant that he had questions about what raw materials to confirm with him.  Exhibit 14.  Almost immediately thereafter, the defendant, who was considering hiring ex-Trelleborg employee Gang Liu, advised Kui Bo that Gang Liu had "kept the technical data for Trelleborg." 7/17/19 Tr. at 1686.  On April 14, 2015, Huang (from China) communicated to the defendant that he needed "information regarding formula, preparation process and performance of the syntactic materials." Exhibit 15.  On April 15, 2015, just a few days after Liu was hired to Offshore Dynamics, Inc. (ODI)—another company that the defendant controlled—Liu sent the defendant Trade Secret 4 in the "Reference-Trelleborg" tab of an Excel spreadsheet.  Exhibits 28 & 28A.  On May 8, 2015, Liu sent Shi Trade Secret 6, also in a "Reference-Trelleborg" tab of an Excel spreadsheet.  Exhibit 32 & 32A.  On June 3, 2015, Huang (from China) indicated to Liu that he needed information about raw materials for a carbon fiber macrosphere in order to make raw material purchasing decisions.  Exhibit 33.  Liu responded to

Huang in China, copying the defendant, and provided Trade Secret 7.  In that email to China, Liu, copying the defendant, stated "The attachment provides technical data of the raw materials and prices of part of the raw materials received from Trelleborg for your reference."  Exhibit 33 at USAO35160-61.  In sum, the defendant knew and intended that as the conspiracy stole the trade secrets, the trade secrets were being transferred to China.

After the theft of the trade secrets and their utilization at CBMI and CBMF, the defendant again opined that the PRC should benefit from his theft.  On July 4, 2015, the defendant sent a proposal to, among others, Huang (in China) and Gang Liu.  The defendant described other countries as having monopolized the sales in the market for buoyancy materials and criticized the buoyancy materials made by China.  "Although our country has conducted the related research in this field . . . it's still left behind the advanced level overseas."  The proposal stated that replacing imported products would not only produce more opportunities in the market, but would have "practical economic significance."  Exhibit 4 at USAO35006.  Echoing his Thousand Talents application, the defendant agreed that continued research on buoyancy materials would "help our country's offshore oil drilling keep up with the international advanced level but also will beat the foreign monopolization on this technology and make contribution to the country's Dream of Ocean."  *Id.*  In July 2015, after the transfer of technology had occurred, the defendant was working on a proposal with his wife, Lei Jiang, Huang, and Liu, that stated:  "CBM-Future's research, development and production of deep water drilling materials not only fill in the void of the country's technology and market but, from the international perspective, also help break the monopoly, facilitate competition, and lead to a revolution in buoyancy material technology."  Exhibit 4 at USAO35007.

Another way to "break the monopoly" was HEU's "self-owned IPR [intellectual property rights] and substitution of imports." Exhibit 84 at USAO32698; *see also* Exhibit 2 at USAO32254 (CBMF materials post–Liu hiring referencing "independent intellectual property rights"). The defendant logically concluded that independent intellectual property rights would "break the duo-monopoly of technology and market overseas." Exhibit 5 at USAO35157. On June 8, 2015, after the transfer of the trade secrets, Liu emailed the defendant about a patent application concerning the creation of composite hollow macrospheres. Exhibit 303 at USAO34800. The application was generic and appeared to cover commonly used processes to create composite syntactic foam. *Id.* But the specific "Embodiment" section used ranges consistent with stolen Trelleborg data sent to the defendant in Trade Secret 4. *See* Attachment A (filed under seal).

Indeed, the defendant was aware that a patent application was submitted, and that there was concern that Liu, an ex-Trelleborg employee, was listed as the inventor, because that would create "significant risk" to CBMF. Exhibit 91. However one reads Exhibit 91, it is clear that the defendant and Liu did not want Trelleborg to find out that Liu was the inventor of a patent that, not coincidentally, would have included specifications used by Trelleborg and stolen by Liu and developed by CBMI. And there is certainly a preponderance of the evidence to show that the defendant saw the filing of the patent as one way to further Chinese reduction of imports, wholly in line with HEU's view that deepwater buoyancy material development was relevant not only to "[the PRC's] sovereignty" and "development" but to "self-owned [intellectual property rights] and substitution of imports." Exhibit 84 at USAO32698.

The conspirators believed that by October 1, 2015, they had largely succeeded in digesting the relevant technology of Trelleborg. Liu responded to a Huang email, copying the defendant, that the reference Liu provided earlier concerning hydrostatic pressures for spheres of specific

densities was the production standard of Trelleborg, stating "[i]t appears now that our formula, production process and process control are better than theirs. In fact, we can avail ourselves of this opportunity to calibrate our own standard." Exhibit 144.

On May 11, 2016, the defendant traveled to China. One of the purposes of the defendant's presence in China was to market the stolen technology to the Chinese military, which matched well with CBMF's general goal to market to the military. Exhibit 7 at USAO33288. On May 19, 2016, Liu sent the defendant a presentation entitled "Prospects of Military Applications of Solid Buoyancy Materials," which included the proposed use of syntactic foam in a warship. The presentation cited the U.S. Navy Zumwalt class ship. Exhibit 8 at USAO34757. Similarly, recovered from the defendant's laptop was a PowerPoint presentation last modified by the defendant on May 19, 2016, with a slide stating "Welcome delegation of chief officers from Taizhou Military Sub-command and Linhai People's Armed Force to visit our company." Exhibits 184 & 184A. Also recovered from his computer were slides stating that a "composite buoyancy" material with "composite hollow glass beads" could be used as structural core material for warships, as well as other military uses. Exhibit 185. On May 22, 2016, Huang emailed Shi requesting project descriptions, and the defendant responded on May 24, 2016, with one of the military presentations. Kui Bo testified that Shi had asked Bo and Liu to make a presentation he could present to a Chinese military officer. 7/17/19 Tr. at 1701. Mulvenon testified that the military in China was called the Chinese People's Liberation Army. 7/11/19 Tr. at 832-833. The PLA had its own national geographic organization system, divided into regions, then provinces (military districts), with other subdistricts. *Id*. at 839. Mulvenon also testified that the Taizhou military district was run by a military chain in the PLA. 7/11/19 Tr. at 839. In attempting to sell

technology to this particular subdivision of the PLA, the defendant again made clear his intent to benefit the PRC in any way.

Another example of how the defendant sought to benefit PRC instrumentalities is CBMF's bid to provide services for the 981 drilling platform.  The defendant understood that HYSY (Hai Yang Shi You) 981 was an investment of the Chinese government.  *See* Exhibit 3 at USAO35001 ("In recent years, the country has increased its efforts and investments in marine engineering equipment and has successfully developed the drilling platform HYSY 981 . . . .").  CBMF framed the project as the China Oilfield Services ("COSL") wanting "to repair the damaged buoyancy modules in China . . . and ensure that the platform will have adequate amount of buoyancy module components for its deep-water operation."  Exhibit 127 at USAO34926.[6]  CBMF stated it would "capitaliz[e] on [CBMF]'s advanced composite buoyancy material technology" to complete the project.  Exhibit 127 at USAO34928.  Composite materials included "high pressure resistant composite material hollow macrospheres" which was based on "Independently self-R&D."  *Id.* at USAO34930.  Mulvenon testified that CNOOC held itself out as a state-owned component of China, subordinate to the State Asset Supervision and Administration Commission, with its leadership appointed by the Chinese government.  7/11/19 Tr. at 838-839.

Kui Bo testified that CBMF did not win the project.  7/17/19 Tr. at 1696.  In a recorded conversation that took place on February 28, 2017, after the failed bid, the defendant continued to express an interest in COSL, and Huang stated that they should establish a contact there, and speculated that COSL would prefer a project funded by MIIT instead of the less funded Ministry of Science and Technology.  Exhibit 294A at USAO34829.  In other words, while possessing the

---

[6]     COSL is an oilfield services company that is a subsidiary of CNOOC.  *See also* Exhibit 129 at 13 (track record chart showing customer for "DRBM Repair" in February 2017 as "China National Offshore Oil Company (CNOOC)").

stolen technology, the defendant contemplated benefitting other foreign instrumentalities with stolen, Trelleborg-based technology in projects funded by the PRC.

In sum, the government has shown by at least a preponderance of evidence that the defendant intended to benefit the PRC as he stole Trelleborg's trade secrets.  He made his intentions clear before and after his thefts, and his use of patent applications and dealings with the PLA and CNOOC demonstrated his commitment to his cause.  A 4-point increase in the defendant's offense level is therefore warranted pursuant to U.S.S.G. 2B1.1 § (b)(14)(B).[7]

B.   The Defendant's Leadership Role in the Conspiracy Warrants an Enhancement

Section 3B1.1(a) provides for a role-based enhancement "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  Factors bearing on organization or leadership "include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."  U.S.S.G. § 3B1.1 App. Note 4.  At a minimum, the defendant must "exercise some control over others."  *United States v. Graham*, 162 F.3d 1180, 1185 (D.C. Cir. 1998).  No single factor is dispositive, *Graham*, 162 F.3d at 11285, and the defendant is not required to be the ringleader, *United States v. Taylor*, 339 F.3d 973, 979 (D.C. Cir. 2003).

---

[7]      If the Court declines to apply the requested 4-point increase, a 2-point increase pursuant to U.S.S.G. 2B1.1 § (b)(14)(A) is certainly warranted, based on the same facts set forth above.

The defendant exercised control over several participants, including direct control over Ogoe, Bo, and Liu in order to execute the scheme to steal the trade secrets.[8]   The scheme also involved other participants, including those who participated in the conspiracy as a result of the actions of the defendant, such as Hui Huang, who enabled the transfer of the trade secrets to China and was aware that the Houston end of the conspiracy had taken Trelleborg data, and Johnny Randall and Uka Uche, who provided proprietary information to Ogoe because the defendant made such transfer a condition of Ogoe's employment.   *United States v. Vega*, 826 F.3d 514, 539 (D.C. Cir. 2016) ("[A] party who gives knowing aid in some part of the criminal enterprise is a criminally responsible party.").

The defendant was a leader and organizer throughout the timeline of the conspiracy. CBMF and the defendant entered into an agreement in March 2014, in which the defendant took shares of CBMF, and the defendant would actively bring in new technology and high-level talented people, as well as "set up a design team of CBM-Future." Exhibit 12A at USAO35020.   Unlike any of the other defendants, the defendant agreed to be "in charge" of setting up "branch companies in the US or other countries for CBM-Future."   *Id.*   He further agreed to promote the technology and products of CBM-Future.   *Id.*

Shi is listed in CBMF materials as a "world renown (sic) master of marine engineering and equipment from the U.S."   He is listed as one of a few shareholders in promotional materials. Exhibit 2 at USAO34587.   CBMF described the defendant as number two in a list of fifteen individuals within the "High Level R&D Team."   Exhibit 2 at USAO34599.   Other materials describe the defendant as "primarily in charge of design R&D and practical application in

---

[8]      The defendant, as a criminally responsible person, is a participant for purposes of counting the number of participants under § 3B1.1.   *See United States v. Walter-Eze*, 869 F.3d 891, 914 (9th Cir. 2017).

engineering the company's products."  It is not surprising, therefore, that CBMF would trust one of its leaders and shareholders with setting up the Houston-based CBMI in order to develop CBMF's manufacturing capacity in buoyancy material.

Shi then set up CBMI in March 2014.  He is listed as "Incorporator" on the Articles of Incorporation, the "organize[r]," and as one of its three directors.  Exhibit 40.  Shi "controlled" CBMI as well as ODI, 7/17/19 Tr. at 1659, to which Shi would later assign Liu.  The defendant sent Bo the letter offering to pay Bo $140,000 a year to work at CBMI.  Exhibit 242.  The defendant paid Ogoe $2,000 for an initial presentation he gave during an interview, and he made the decision to hire Ogoe.  7/17/19 Tr. at 1671.  Indeed, the defendant hired Ogoe even though Bo noted to the defendant that Ogoe had a potential noncompetition agreement that could affect his employment. 7/17/19 Tr. at 1676.  The defendant offered Ogoe $100,000, more money than Ogoe had ever made in salary per year, and Ogoe accepted.  Exhibit 250.  The defendant maintained control over Ogoe; for example, when the defendant and Ogoe traveled to a materials seller used by Trelleborg, the defendant directed Ogoe not to mention to Houston Foam that the defendant and Ogoe were making beads that Trelleborg also made.  7/18/19 Tr. at 1808.  And when Ogoe went to China to help set up the factory, it was the defendant who operated as Ogoe's intermediary.  7/18/19 Tr. at 1813.

When Bo showed the defendant Liu's resume, the defendant made the decision not to interview him, Exhibit 255, and then it was the defendant who changed his own mind and made the decision to interview Gang Liu.  7/17/19 Tr. at 1785.  In fact, the defendant made this hiring decision at least in part because "Gang Liu kept some technical data from Trelleborg."  7/17/19 Tr. at 1686.  Shi directed Bo to get an attorney to review Liu's agreement with Trelleborg.  The ultimate decision of whether to hire an attorney was the defendant's, 7/17/19 Tr. at 1690, and the

defendant made the decision to hire Liu even though Bo could not obtain an attorney to review Liu's agreement.  In order to pay these salaries, the defendant was the sole American signatory authority over the more than $3.1 million received from CBMF.  Exhibit 318; 7/18/19 1904-1906 (testimony that defendant was signatory to the account).   The Court should conclude that the defendant made the key hiring decisions, in part to steal the trade secrets, and maintained control of the money used to pay the ex-Trelleborg employees.

The defendant also controlled other aspects of the conspiracy.  After Liu was hired by the defendant, Liu provided a formula (Trade Secret 5) to the defendant.  The defendant then directed Bo to "do it in the CBM lab" and to "make all the material available in the lab."  Exhibit 170.  Bo replied that he would, and Bo, Liu, and the defendant attempted to make syntactic foam in May 2015, using the stolen formula.  See Exhibit 228 (video of defendant working with Bo and Liu to make syntactic foam).  The defendant maintained control of intellectual property, directing Bo, for example, to construct non-competition and trade secret protection agreements.  7/17/19 Tr. at 1678. He also directed Bo and Ogoe and others to write summaries for him on a daily and weekly basis. 7/17/19 Tr. at 1684.

The defendant directed Bo and Liu in May 2016 to make a presentation for a subdivision of the PLA.  7/17/19 Tr. at 1701 ("[The defendant] called us, called me and Gang Liu . . . to make such presentation so he could do a presentation in China for a Chinese military officer.").  When CBMI made a presentation on May 23, 2017 to undercover FBI agent Dave Jones, it was obvious that the defendant "was leading the meeting from CBM's side."  7/10/19 Tr. at 485.  The Court should conclude that the defendant was the public face of CBMI in marketing and selling its technology offerings, and that the defendant directed others in the conspiracy to perform tasks to help that marketing effort.

In sum, the defendant hired and managed employees who had the specific role of transferring and misappropriating trade secrets.  The defendant had significant financial incentives to drive CBMI towards the goal of the theft of trade secrets, and controlled the purse strings of how money was disseminated in the company.  The concept of control connotes a hierarchal relationship, in the sense that the employer is hierarchically superior to his employee.  *See United States v. Quigley*, 373 F.3d 133, 138 (D.C. Cir. 2004).  The defendant did not need to steal from Trelleborg himself because others did so and provided secrets to him as a condition of their employment, which he arranged to have developed.  *See, e.g.*, *United States v. Olejiya*, 754 F.3d 986, 991 (D.C. Cir. 2014) (through recruitment, the defendant "ensured that he would not perform the risky task of cashing a fraudulent check but would instead superintend underlings who performed the task at his behest").  The criminal activity demanded not only the possession of the trade secrets but their conversion into useful data and formula for the conspiracy. The activity required the involvement of the defendant, Ogoe, Bo, Liu, and Huang.  Moreover, it involved other conspirators who had more limited roles but still had culpability, like Uche and Randall.  The activity therefore involved five or more participants, and was otherwise extensive.  *See United States v. Wilson*, 240 F.3d 39, 49 (D.C. Cir. 2001) ("otherwise extensive" demands "a showing that an activity is the functional equivalent of an activity involving five or more participants"). The government has met its burden of establishing by a preponderance of the evidence that the defendant was a leader and organizer of the criminal activity and that it involved five or more participants or was otherwise extensive; thus, pursuant to §  3B1.1(a), there should be a four-level increase to the defendant's base offense level.

In sum, the Court should start with a Base Offense Level of 6.  U.S.S.G. § 2B1.1(a)(2).  The Court should add 14 levels for the determined loss.  U.S.S.G. § 2B1.1(b)(1)(H).[9]  The Court should also add four levels for the foreign benefit.  U.S.S.G. § 2B1.1(b)(14)(B).  Last, the Court should add an additional four levels for the defendant's leadership role in the offense.  U.S.S.G. § 3B1.1(a).  The defendant's Adjusted Offense Level should be 28, with a recommended sentencing range of 78 to 97 months of incarceration.

**18 U.S.C. § 3553(a) Factors**

A Guidelines-compliant sentence is appropriate where, as here, no downward departure is warranted, and an analysis of the § 3553(a) factors reveals no reason to vary from the carefully constructed and long-standing Guidelines.  In the context of this crime, the most important § 3553(a) factors are the need to reflect the seriousness of the offense, provide just punishment, and deter future crimes of this nature.

This was a serious offense.  The Economic Espionage Act of 1996, which includes the statute for the offense of conviction, 18 U.S.C. § 1832, was intended to protect national and economic security.  As indicated in the House Report, "There can be no question that the development of proprietary economic information is an integral part of America's economic well-being.  Moreover, the nation's economic interest are part of its national security interests.  Thus, threats to the nation's economic interest are threats to the nation's vital security interests."  H.R. Rep. No. 104-788, at 4 (1996), *reprinted in* 1996 U.S.C.C.A.N. 4021, 4023.

The defendant methodically hired ex-Trelleborg employees with access to trade secrets, and then he exploited their information until he believed he had accomplished in a few months

---

[9] The Final PSR states that the increase is 12 levels, but the government believes the loss amount requires that the offense level is increased 14 levels pursuant to U.S.S.G. § 2B1.1(b)(1)(G).

what took Trelleborg years and many millions of dollars to build.  The defendant first took advantage of Ogoe's ability to improperly access proprietary information from then-Trelleborg employees Uche and Randall, and then took advantage of Liu's cache of proprietary information taken from Trelleborg.  Indeed, it is a reasonable inference that the defendant made his employees' ability to access Trelleborg proprietary information a condition of their employment.  The defendant did this despite his knowledge that the industry guarded its proprietary information both generally, *see, e.g.*, 7/11/19 Tr. at 867, 869, 870 (Schlegel), and specifically through legal agreements, such as Ogoe's, which required that Ogoe not disclose items defined by a wide range of terms such as  "proprietary or technical data, know-how, trade secrets, inventions, processes, designs, specification, manufacturing techniques, models, plans, diagrams, reports, drawings, patterns and blueprints . . . ."  Exhibit 51.  The defendant took this path even though he understood from sources like Ray Wong that there was an expensive barrier to entry.  *See* Exhibit 102 at 9.

The defendant repeatedly made the decision to misappropriate Trelleborg's trade secrets because he wanted to use Trelleborg's intellectual capital to make money.  He also wanted to export the trade secrets to China and benefit the PRC, which increases the seriousness of the offense.  Finally, that the defendant used his positions at CBMF and CBMI to tempt Ogoe and Liu to help him misappropriate the trade secrets made him the engine of the conspiracy; without the defendant, the conspiracy likely would not have had the resources to bring the trade secrets to CBMI or develop them at CBMI and CBMF.

For these reasons, a sentence of 78 to 97 months is sufficient, but not greater than necessary to comply with the purposes of § 3553(a).

There are two additional issues concerning amounts owed by the defendant in connection with the scheme.

C. <u>The Defendant Should Provide Restitution for the Victim's Expenses Incurred in Assisting the Government.</u>

Trelleborg was unaware until being informed by the Federal Bureau of Investigation (FBI) in October 2016 that the conspiracy had misappropriated its trade secrets.  Thereafter, Trelleborg assisted the FBI and subsequently the Department of Justice in investigating and prosecuting the case.  This investigation included coordinating meetings with Trelleborg officials and employees; providing documents pursuant to subpoena; meetings between the government and Trelleborg officials and employees; and live testimony during trial.   Attachment B is a letter from counsel for Trelleborg, detailing two categories of expenses:   legal fees incurred as a result of the investigation and prosecution of the conspiracy, redacted receipts for which are attached as Attachments C and D, and internal Trelleborg expenses.  Trelleborg calculates its legal expenses related to the government investigation and prosecution as $542,103, and its in house expenses as at least $41,625.  In total, Trelleborg provides a basis for restitution of  $583,728

The Mandatory Victims Restitution Act of 1996 (MVRA) requires that "when sentencing a defendant convicted of [an offense against property], the court shall order . . . that the defendant make restitution to the victim of the offense."  18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii).  The "ordinary meaning" of the term "restitution" is "restoring" the victim "to [the] position [it] occupied before" the offense.  *Hughey v. United States*, 495 U.S. 411, 416 (1990).  Section 3663A(b) sets forth loss categories, including § 3663A(b)(4), which requires the sentencing court to order the defendant to "reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense."

At issue here are the victim costs spent participating in both the government's "investigation" and "prosecution" of the offense.  In *Lagos v. United States*, 138 S. Ct. 1684

(2018), the Supreme Court held that the phrase "the investigation or prosecution of the offense" linked "investigation" and "prosecution" to refer only to government's criminal matter. *Lagos*, 138 S. Ct. at 1688. As a result, although *Lagos* excluded "private investigations and civil or bankruptcy litigation" costs from mandatory restitution, it upheld mandatory restitution for costs during and associated with "government investigations and criminal proceedings." *Id*; *see also United States v. Papagno*, 639 F.3d 1093, 1100 (D.C. Cir. 2011) (consistent pre-*Lagos* decision holding that § 3663A(b)(4)  would include, for example, "the expense involved in producing documents in response to a subpoena or document request," where the victim "do[es] something required or requested by the criminal investigators or prosecutors").

In sum, the Court should issue a restitution order requiring the defendant to pay to Trelleborg the amount of $583,728.

D. <u>The Sentence Should Include the Agreed Upon Forfeiture</u>

The parties have agreed to a proposed consent order of forfeiture for a money judgment of $342,424.96, which represents a settlement over the properties and bank accounts used during the theft of trade secrets scheme to facilitate the theft, and/or was property constituting or derived from any proceeds obtained as a result of the offense, and/or constitutes or is derived from proceeds traceable to the offense.   A proposed consent order of forfeiture will be submitted separately to the Court. Should the Court provide restitution to Trelleborg, 18 U.S.C. § 981(e) permits the Attorney General to transfer forfeited funds "as restoration to any victim of the offense giving rise to the forfeiture," but the Attorney General is also permitted to simply retain them, and the statute does not authorize the Court to transfer assets in order to satisfy any restitution. *See United States v. Baydoun*, No. 06-CR-20632-DT, 2019 WL3818257, at *2 (E.D. Mich. Aug. 14, 2019). Although this office does not oppose in general whether to apply the defendant's forfeited

funds to a restitution obligation, Department of Justice procedures mandate an investigation process that will not be completed by the time of sentencing.

Respectfully submitted,

TIMOTHY J. SHEA
United States Attorney
D.C. Bar No. 437437

By:           _____/s/_____

Jeff Pearlman
D.C. Bar No. 466-901
Luke Jones
Virginia Bar No. 75053
Assistant U.S. Attorneys
United States Attorney's Office
555 Fourth St., NW
Washington, D.C. 20001
202-252-7066 (Jones)
202-252-7228 (Pearlman)
Jeffrey.pearlman@usdoj.gov
Luke.jones@usdoj.gov

Matthew R. Walczewski
Illinois Bar Number 6297873
Senior Counsel
Computer Crime and Intellectual Property Section
Criminal Division
United States Department of Justice
1301 New York Avenue NW
Washington, D.C.  20005
202-514-1026
Matthew.walczewski@usdoj.gov