**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No: 1:17-cr-110-CRC** |
| **SHAN SHI** | |
| **Defendant.** | |

**DEFENDANT DR. SHAN SHI'S MEMORANDUM IN AID OF SENTENCING**

Dr. Shan Shi, by and through the undersigned counsel, respectfully submits this memorandum in aid of sentencing, and requests a below-Guidelines, non-custodial sentence of probation or home confinement.

## I.    **INTRODUCTION**

Dr. Shi was convicted after trial of one count of conspiracy to commit theft of trade secrets, in violation of 18 U.S.C. § 1832(a)(5). The jury acquitted him of economic espionage (18 U.S.C. § 1831) and money laundering (18 U.S.C. § 1956(h)). As the Court knows, the case arose out of Dr. Shi's business, CBMI, which made syntactic foam. The government alleged, and the jury found, that Dr. Shi stole a trade secret (or secrets; because there was no special verdict, there is no way to know what, exactly, the jury determined Dr. Shi actually stole) from Trelleborg. The government maintained, and the jury apparently found, that Dr. Shi planned to steal trade secrets from Trelleborg by hiring Gang Liu, a former Trelleborg employee who had been laid off. Liu had retained materials belonging to Trelleborg at the time he was laid off and continued to possess those materials when hired by Dr. Shi.

It would be difficult to overstate the devastating impact that this prosecution and conviction has already had on Dr. Shi's life. Four years ago, Dr. Shi was a successful entrepreneur, a renowned engineer with sterling academic and professional credentials, living a quiet life with his wife and two children in Houston, Texas. Dr. Shi has spent the past twenty years in the Houston community, where he has put down deep roots. He built businesses that employed hundreds of people and greatly advanced the field of offshore engineering. Dr. Shi is a devoted father to two young children, ages eleven and six. He is also an accomplished and talented musician, who has played concerts for charitable organizations all over the Houston community.  In addition, Dr. Shi volunteered as a coach for his son's ice hockey team, stopping only when he was arrested in this case. Dr. Shi is also active in his local church, which he attends weekly.

Dr. Shi stands before the Court with that life now in shambles. All that he has worked to accomplish—his business, his career, his reputation, his and his family's financial and emotional security—is wiped out. He is already a convicted felon, with his brilliant, three-decade engineering career over and his reputation damaged beyond repair.

The Pre-Sentence Investigation Report ("PSR") (ECF No. 309) found Dr. Shi's offense level to be 26 (base offense level 6; intended loss enhancement of 12; special offense characteristic enhancement of 4; and role in offense enhancement of 4), which yields a sentencing guideline range of 63-78 months. The defense maintains that the correct offense level is 20 (base offense level of 6; intended loss enhancement of 12;[1] no special offense characteristic enhancement;[2] and a two (not four) level adjustment for role in the offense. An offense level of 20 yields a sentencing guideline range of 33-41 months.

Under either analysis, the Guidelines overstate the seriousness of the offense. Instead, the Court, after considering the Guidelines, should consider *all* of the sentencing factors set forth in 18 U.S.C. § 3553(a), as well as what other judges have done in imposing sentences in similar cases, and depart downward. Specifically, based on the facts of this case, the otherwise exemplary and unblemished life that Dr. Shi has led as a husband, father, and member of his community, as well as the sentences imposed around the country in similar cases, a sentence of probation with continued home-confinement is sufficient, but not greater than necessary, to satisfy the sentencing factors set forth in § 3553(a).

---

[1] Dr. Shi has asked for reconsideration of the Court's loss amount determination. *See* ECF No. 311.

[2] As explained in Dr. Shi's Objections to the PSR, while one of the trade secrets did leave the United States, the jury specifically found that Dr. Shi's alleged conduct was not done to benefit China, a finding that was wholly supported by the evidence—or more specifically—the *lack* of evidence on this point.

## II.    BACKGROUND

### A.    Dr. Shi's early life and education.

Dr. Shan Shi was born in 1964 in Shanghai, China. He grew up in a small harbor city in Jiangsu Province, on the east coast of China, where he lived with his mother, a pediatrician, until he was eleven years old. His father, a professor of Chinese and Indian ancient civilizations, lived hundreds of miles away in Beijing. Dr. Shi's parents were forced to live apart for most of his childhood because his mother was Catholic. During the Cultural Revolution in 1966, Christians were not permitted to move to Beijing, where Dr. Shi's father worked. As a result, Dr. Shi's parents were not permitted to live together and Dr. Shi saw his father only once a year for the first 11 years of his life. After his 11th birthday, Dr. Shi left his mother and went to live with his father in Beijing, where the schools were more selective and challenging. Several years later, his mother was finally permitted to move, and rejoined the family in Beijing.

In addition to living in a one-parent household, Dr. Shi suffered from a tumor that affected his sinuses, which led to multiple hospitalizations and operations as a child. These hospitalizations forced Dr. Shi to graduate two years late from high school. Unable to participate in the physical, outdoor activities typical of children his age, and concerned that he may have a short lifespan, Dr. Shi become an avid student and excelled at school. He soon found a particular talent for engineering.

Dr. Shi graduated from high school at age 20 and decided to study Naval Architecture & Ocean Engineering. After receiving his undergraduate degree in 1988, Dr. Shi joined the Marine Design and Research Institute of China. After two years of design practice as a naval architect, Dr. Shi decided to pursue his graduate degrees in the U.S. He came to the U.S. in December 1990 to study civil and structural engineering at the University of Wisconsin at Milwaukee, where he received a Master's degree in 1994. Dr. Shi earned a second Master's degree and a Ph.D. in 1997

3

from the University of Illinois in structural and earthquake engineering.

Multiple graduate degrees in hand, Dr. Shi moved to Houston, which was and remains, the center of offshore oil and gas development. After working at a series of offshore drilling and engineering companies, Dr. Shi became an independent consultant and advanced researcher to the offshore industry. He established Offshore Dynamic Inc. ("ODI"), which developed advanced software for offshore platform design and analysis. He also taught engineering courses at Singapore National University and Tianjin University, and gave lectures at Texas A&M University, the University of Houston, and the University of Texas at Austin.

In 2007, Dr. Shi co-founded Houston Offshore Engineering LLC ("HOE"), which engineered offshore floating platforms. For the following 10 years, HOE was one of the fastest-growing petroleum engineering companies in Houston, and employed more than 150 engineers. In 2014, Dr. Shi sold his interest in HOE to a company in the United Kingdom.

**B.      Dr. Shi's family and civic life.**

Dr. Shi married his wife, Lei Jiang, in 2007. One year later, Dr. Shi's son was born. In 2013, Dr. Shi was blessed with a daughter.

Dr. Shi's life outside of engineering centered on his passion for music and ice hockey, passions he shared with his family. Dr. Shi's interest in music began when he was a child. Although Dr. Shi had no formal musical training in his youth, his keen interest led him to study music theory and attend weekly symphonic concerts with money he saved. Finally, at the age of 20, he was able to rent a French horn, and started taking formal lessons. He auditioned for and was admitted into his university's orchestra. After Dr. Shi moved to Houston in 1998, he restarted French horn lessons at Houston Community College and played in the Houston Symphonic Band. In 2013, Dr. Shi joined the non-profit Houston Chinese Traditional Music Group as a committee member. This music group focused on introducing classic Chinese music to the local community. Dr. Shi has

performed a Chinese New Year and a mid-year Concert every year since 2013, and he has also performed at charity concerts at his church, in high school performing arts centers, and other places of worship, such as the Texas Buddhist Association's Jade Buddha Temple and Houston Baptist University's Belin Chapel.

In 2014, Dr. Shi and local professional musicians co-founded the non-profit Texas Philharmonic Folk Orchestra, which focused on Western instruments and music. Dr. Shi donated a full set of professional timpani drums and many other instruments to the Orchestra. He was in charge of the brass section, which involved selecting players, coordinating and arranging group practices, and working closely with the conductor. Dr. Shi not only donated the initial investment and operational funds to support this orchestra, but also helped secure other business sponsors. To introduce classical music to low-income families in the community, Dr. Shi purchased large amounts of concert tickets and distributed the tickets for free.

Dr. Shi works hard at imbuing the love of music in his children. He devotes an hour daily to teaching them music. His son is a talented musician, who can play piano, French horn, and harp. Learning from his father's dedication, his son has won musical competitions on both the local and state level, and in May 2019, he won 1st place in a Texas state music contest.

Dr. Shi's other passion is ice hockey. Although he learned to skate as a child, he did not take up ice hockey until he moved to Houston. After joining a local league, Dr. Shi got his wife involved in the sport and it quickly became a favorite activity for them both. Dr. Shi taught his son to skate at a very early age, and he began playing youth hockey at age five. Dr. Shi volunteered with his son's team and did everything from helping the kids put on their skates, to supervising practices and off-ice workouts, to setting up training equipment. He also operated the game clock and recorded the game stats. Over the years, Dr. Shi became an assistant coach for the eight, ten,

and twelve and under youth hockey league, which required him to attend practices three days per week, help players with equipment, organize practice sessions, encourage players, and provide game-time strategy. His son eventually became a top player and one of the team captains. Dr. Shi's involvement with youth hockey ended with his conviction and home confinement.

Dr. Shi has contributed generously both the University of Illinois and Texas A&M University.  He has made yearly donations to both universities totaling more than $100,000 to support scientific research.

Dr. Shi regularly attends church and participates in Bible studies. To resolve his anxiety resulting from this case, he now attends weekly services at the Houston Chinese Church, a multi-cultural, evangelical church.

### C.      Dr. Shi's professional accomplishments.

After graduating from the University of Illinois and moving to Houston in 1997, Dr. Shi worked at Deep Oil Technology Inc. ("DOT"), a research and development company staffed with industrial experts. Dr. Shi's work led to the creation of the world's first ultra-deep-water floating oil production Spar platform. The Spar technology was later sold to Exxon and Chevron for leading-edge oil and gas deep-water projects.

In 2001, Dr. Shi established his own company, Offshore Dynamics Inc. ("ODI"). During the day, Dr. Shi worked as an independent consultant for offshore engineering companies. Each night from 8:00 p.m. until 2:00 a.m., Dr. Shi developed accurate simulation software to compute the loads and motions of offshore floating structures that accounted for waves, wind, and current environmental conditions. Without accurate load and motion information, offshore structures were either designed unsafely or more robustly than needed. Dr. Shi's years of nighttime hours paid off when he successfully designed software to solve this pervasive problem. This state-of-the-art software eventually become a standard tool for offshore engineering design and analysis.

In 2007, Dr. Shi co-founded HOE, which became one of the fastest-growing engineering companies in Houston. In 2017, Dr. Shi sold his share of HOE.

Dr. Shi also taught countless students. He was a visiting professor at National University of Singapore (2006–07, 2013–17); and a guest professor at Tianjin University, China (2003–04). Dr. Shi also taught at the University of Texas at Austin (2015–16) and at Texas A&M University (2012–14).

### D.     Dr. Shi's contributions to U.S. technologies.

As an active independent consultant and advanced researcher, Dr. Shi worked on many challenging deep-water projects and solved many difficult engineering problems presented by working in ultra-deep-water. Dr. Shi published technical papers almost yearly that sought to overcome these challenges, and he developed new offshore engineering design concepts, theoretical derivations, state-of-the-art simulation systems, and new green energy developments. Below are some of Dr. Shi's achievements:

### 1.     A state-of-the-art simulation system for offshore engineering design and evaluation.

Dr. Shi developed HARP–Hydrodynamics Analysis and Research Package–at ODI. Although Dr. Shi initially developed this software system for his own consulting work, he made it available to the industry so it could be used to build safe and secure offshore structures. HARP became one of the most advanced, recognized, and reliable tools for floating platform design and analysis. This award-winning software is used by many companies worldwide and in the U.S. including Samsung, Hyundai, Petronas, BP, Shell, Hess, ABS, and Lockheed Martin Corp.[3]

---

[3] Due to his conviction in this case, Dr. Shi has been unable to update this software and has not been able to provide necessary support for HARP users.

### 2.   Contributions to U.S. floating oil production systems.

Dr. Shi was involved in the research and development of a new generation of ultra-deep-water platforms, and designed floating production systems, including Spars platforms, tension leg platforms, and semi-submersible platforms that operate in water depths up to 8000 feet.

### 3.   Dr. Shi solved offshore problems and prevented offshore disaster in the Gulf of Mexico.

While working at Aker Engineering, Dr. Shi predicted a critical fracture of a new Chevron production platform that cost over one billion dollars. Dr. Shi convinced the platform operator to shut down operations for one year to conduct repairs and upgrades, which prevented an offshore disaster in the Gulf of Mexico. Dr. Shi also helped save the largest U.S. semi-submersible production platform after it was severely damaged by a major hurricane and nearly capsized.

### 4.   Dr. Shi contributed to the U.S. Department of Energy's Research Partnership to Secure Energy for America ("RPSEA") program.

Dr. Shi spent years contributing to DOE's RPSEA program. His work focused on the forecast and hindcast of environmental damage due to hurricanes, significant internal waves, and large currents. Dr. Shi's work was one of RPESA's best developments, and he received the "Best of RPSEA" recognition in 2016.

### 5.   Dr. Shi's development of deep-sea mining technology.

Dr. Shi helped solve a long-standing deep-sea mining problem through his design of an ultra-deep-water numerical tool. Deep-sea mining seabed's contain nodules that form due to chemical accretion of minerals at sea water depth ranges of 4000–6000 meters. To mine these nodules, a suction dredge is used, which must be connected to the surface by a pipe and pumps capable of moving 20,000 tons per day of solids. It had been an enduring challenge to connect the pipe and collector. Dr. Shi developed a numerical tool to compute forces for various configurations and for various kinematics of the mining vessel and the collector. This helped solve the mining

problem.

> **6.     Dr. Shi's development of green energy for Lockheed Martin and the State of Maine.**

Dr. Shi consulted with Lockheed Martin to develop the world's first offshore ocean thermal energy conversion system, and provided engineering support to the State of Maine for its offshore wind energy development.

> **7.     Dr. Shi's patent for DRBM vortex induced vibration ("VIV") suppression.**

VIV is a serious problem for offshore operations in the Gulf of Mexico due to large loop currents. Dr. Shi successfully developed an innovative configuration for the riser buoyancy module that can effectively suppress this damaging vibration.[4] His innovation resulted four U.S. Patents. *See* U.S. Patent Nos. D861,736 S; D847,211 S; 10,400,518 B2; 10,006,254 B2.

> **8.     Dr. Shi is writing a book titled "Numerical Method for Offshore Engineering" for new graduates and engineers.**

After years of engineering consulting and graduate teaching, Dr. Shi discovered that most new engineers lack the computational tools needed for advanced research and development. Hydrodynamic and structural computational tools are integrated in commercial software that is not available to the public. Dr. Shi is working with Springer Publishing Company to publish a book that makes all critical computational routines currently programed in his HARP commercial software publicly available. This will help advance graduate research and help new engineers avoid computational and engineering mistakes in the offshore industry.

**E.     CBMI**

Create Better Materials for the Future ("CBMF"), the parent company of CBMI, was

---

[4] Dr. Shi gave a detailed presentation on how to solve the VIV problems to Mark Angus, and agreed to share his design with Trelleborg to make Trelleborg's DRBM product more competitive.

established in China in 2012. Dr. Shi had no connection to CBMF when it was established. He met the founders in Houston at the 2013 Offshore Technology Conference, where they displayed Chinese syntactic materials. Dr. Shi was shown CBMF's fully developed syntactic foam line.[5] CBMF asked Dr. Shi to design and market offshore engineering products, such as DRBMs, using CBMF's syntactic materials and their patented advanced ceramic macrospheres. Dr. Shi agreed and in 2014 formed CBMI, a wholly owned subsidiary of CBMF, registered in Texas.

Despite the government's suggestions to the contrary,[6] it is simply untrue that CBMI was little more than a criminal enterprise set up to steal trade secrets from Trelleborg. Although the government argued that CBMI had no realistic ability to succeed in the syntactic foam business without stealing from others, as noted above, CBMF was already in the syntactic foam business before approaching Dr. Shi, and had acquired critical patents, technical know-how, and production facilities before they hired Dr. Shi. The notion that the trade secrets forwarded by Johnny Randall, Uka Uche, and Gang Liu are the only way CBMI could have produced macrospheres is belied by the fact that CBMF had already made macrospheres before ever interacting with Trelleborg.

The evidence at trial showed that CBMF not only had equipment, but was already making macrospheres and syntactic foam years before Dr. Shi was hired (and any Trelleborg trade secrets were transmitted). Bo admitted that he saw "macrospheres from Professor Qiao [from CBMF] in China." Tr. 1737 (citing DTX-1054); *see also* DTX-1054 (showing images of CBMF-made macrospheres dated July 2014). Ogoe admitted that "[CBMF] had a hydrostatic test machine in China." Tr. 1812. And the government introduced a CBMF presentation showing capabilities and testing facilities as early as 2006:

---

[5] CBMF already had numerous published patent applications that covered syntactic foam processes, which were developed at HEU under Professor Yinjie Qiao as early as 2008.

[6] *See, e.g.*, ECF No. 291 at 2-3; ECF No. 292 at 3-5.

GTX-84 at USAO-032714; *see also id.* at USAO-032724 (listing CBMF's issued patents and published applications for buoyancy materials, including macrospheres), USAO-032727 (mid-2012 dated photos of commercial buoyancy products). A 2014 presentation introduced by the government noted that CBMF had "[c]ompleted transformation to automation of the production line in February 2014 for reaching a production capacity of $10M^3$ of deep sea buoyancy materials per shift per day and expanding the production to resin-based composite materials as well as elastometric and foamed materials." GTX-2 at USAO-034574; *see also id.* at USAO-034595 (listing "Achievements of Industrialized Construction"), USAO-034599 (listing 15 members of CBMF's "High Level R & D Team"), USAO-034598 (describing CBMF's "Scientific Research Center Construction" with "more [than] 30 renown professors, researchers, and graduate engineers, and graduate students of PhD and Master candidates"), USAO-034601 (describing CBMF's "Research Capability").

## III.   DOWNWARD DEPARTURE OR VARIANCE

Regardless of whether the Court determines Dr. Shi's offense level is 26 (with a guideline range of 63 – 78 months) or, as the defense maintains, level 20 (with a guideline range of 33 -41 months), a downward departure or variance is appropriate and warranted. In light of Dr. Shi's

personal history and circumstances, the defense respectfully requests that the Court impose a non-custodial sentence of time-served with probation or home confinement. No incarceration is necessary to achieve the goals of sentencing.

### A. The Guidelines are advisory, and the sentence should be no greater than necessary to satisfy the statutory purposes under § 3553(a).

At the outset of sentencing, the Court must determine the applicable Sentencing Guidelines range. *See Molina-Martinez v. United States*, 136 S. Ct. 1338, 1342 (2016). Although the Guidelines were once mandatory, following *United States v. Booker*, 543 U.S. 220 (2005), the Guidelines no longer carry the force of law, federal judges are no longer bound to strictly apply them, and "[a] district court may not presume that a Guidelines sentence is reasonable." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). The Guidelines are now purely advisory, and the Court has significant discretion to vary from the Guideline range. *See id.* at 187–88. Instead of applying the Guidelines as compulsory, the Court has discretion to impose a non-Guideline sentence as long as the sentence is reasonable and justified. *See United States v. Jimenez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006) (en banc) ("*Booker*'s remedial solution makes it possible for courts to impose non-guideline sentences that override the guidelines, subject only to the ultimate requirement of reasonableness."), *abrogated on other grounds by Rita v. United States*, 551 U.S. 338 (2007); *see also Koon v. United States*, 518 U.S. 81, 96–97 (1996) (determining that a district court is vested with broad discretion to depart from the Guidelines); U.S. Sentencing Guidelines, §5K2.0 (2018).

The Guidelines are now but a "starting point and initial benchmark" for sentencing. *Gall v. United States*, 552 U.S. 38, 39 (2007). After calculating the Guidelines range, the Court must then "make an individualized assessment based on the facts presented" by the parties. *Id.* Post-*Booker* sentencing involves two steps—after the first step of calculating the Guideline range, the

Court must engage in the second step of considering the § 3553(a) factors to determine a reasonable sentence. *See United States v. Talley*, 431 F.3d 784, 786 (11th Cir. 2005), *abrogated on other grounds by Rita*, 551 U.S. at 338. Just as the Court has discretion to impose a non-Guidelines sentence, "the weight to be afforded any § 3553(a) factor is a matter firmly committed to the discretion of the sentencing judge." *United States v. Verkhoglyad*, 516 F.3d 122, 131 (2d Cir. 2008) (quotation marks omitted). Furthermore, the Court has discretion to decide whether any § 3553(a) factor justifies a downward variance. *See Gall*, 552 U.S. at 51. When imposing a sentence outside the Guidelines range, the Court applies a non-mathematical formula with individualized assessments based on facts presented by the parties. *See id.* at 47, 50.

This Court must be guided by the fact that the ultimate sentence should be "not greater than necessary to accomplish the sentencing goals advanced in § 3553(a)." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

### B.   A non-custodial sentence is appropriate in light of Dr. Shi's personal history and characteristics (§ 3553(a)(1)).

Dr. Shi respects the decision by the jury. His embarrassment and shame are palpable. But as his support letters attest, he is not a bad or evil person. To the contrary: those who have known Dr. Shi for decades find him to be a good and decent man, a devoted husband and father, and an active member of his local community. He poses no threat to society. He is not a danger to reoffend. The devastating impact of this conviction will reverberate on Dr. Shi and his family for the remainder of his life. Incarcerating Dr. Shi serves no societal purpose.

### C.   Dr. Shi's conduct was inconsistent with a law-abiding and rule-following life.

Dr. Shi has lived a life unblemished by even a hint of impropriety—much less illegal activity—of any kind. He is a devoted husband, father, and contributing member of his community, fully engaged in the civic life of Houston. He has remarkable scientific and engineering

accomplishments. He is a successful entrepreneur who started a business that, before he sold it, employed several hundred people. Throughout all of this, he never had so much as a speeding ticket. Dr. Shi's colleagues and friends all attest to how completely out of character for Dr. Shi this conviction is:

- James Wang, a long-time friend, said he was "shocked" when he read of these allegations because "Dr. Shi has had a demonstrated history of impeccable character, excellence in the Chinese community, and is a devoted husband and loving father." Ex. A.

- Yan Qu, a research professor at Southern University of Science and Technology, who has known Dr. Shi for 12 years, noted that Dr. Shi was "well recognized [for his] professional ethics and upright personality." Ex. B.

- John Halkyard, a life Fellow of the American Society of Mechanical Engineers, who has known Dr. Shi for over 20 years, wrote that Dr. Shi "has always displayed the most straightforward and ethical approach in his business and personal dealings," and that "[i]t is completely out of character for him to engage in any illegal conduct of any kind." Ex. C.

- MooHyun Kim, a professor of Ocean Engineering at Texas A&M University, who has known Dr. Shi for more than 15 years, noted the charges "shocked" him and that Dr. Shi has always shown himself to be a person of "integrity and honesty in his business and personal dealings." Ex. D.

- Niey-Bor Hsyung, who has known Dr. Shi for 20 years, considers Dr. Shi to be a "a man of integrity" who "is a person of honor and a straightforward gentleman." Dr. Hsyung said he could not "imagine [Dr. Shi] taking advantage of anyone, let

alone stealing their business secrets," and that it was "impossible" for him to imagine Dr. Shi committing crimes. Ex. E.[7]

These letters demonstrate that these offenses were completely at odds with the man whom these people have known well for decades. Dr. Shi has lived an exemplary life. It is not just the fact that he has no prior criminal convictions, thus giving him a Criminal History score of I, but Dr. Shi has never been accused or associated with *any* bad conduct of any kind, ever. That puts him in a category that is truly rare among criminal defendants – someone who has heretofore lived a life beyond reproach.

**D.     Dr. Shi has already paid an enormous price for his conduct.**

Even before serving whatever sentence the Court imposes, Dr. Shi has already paid an enormous price for his conduct. For almost four years, Dr. Shi has been virtually unemployed and unable to earn an income, and is now an unemployable felon. His engineering career is effectively over. The sterling reputation Dr. Shi spent a lifetime building in the engineering community and Houston civic community is gone. Since July 2019, Dr. Shi has been under home confinement, unable to help with his children's after-school activities or to watch them participate in sports or musical activities (with one single exception for his son's recent competition).

The financial impact of this case and conviction can be described only as absolutely devastating. As noted above, Dr. Shi has been unable to earn any significant income for the past few years, and his future prospects are extremely dim, given his conviction. Dr. Shi will lose his engineering license as a result of this conviction. As noted in the PSR, his legal fees and the forfeiture agreement he has entered into with the government[8] have put him so deep into debt that it is unlikely he will ever fully emerge. And those are just the direct impacts of the case. The

---

[7] All of the letters written in support of Dr. Shi can be found at Ex. A-L.
[8] Dr. Shi has agreed to forfeit $342,424.96.

indirect impacts are also devastating.

For example, in 2014 Dr. Shi sold his share of HOE, the business he started. The parties agreed that nearly $600,000 of the sale proceeds would be held in escrow until October 1, 2017. After Dr. Shi was charged in this case—which was entirely unrelated to the operation of HOE— the buyer reneged on his agreement and refused to make its final escrow payment to Dr. Shi. The buyer has tried to justify this decision by asserting that Dr. Shi's arrest caused negative publicity, despite no evidence of any publicity associated with HOE. This was nothing more than a blatant attempt by the buyer to take advantage of someone in no position to fight back, and to use the occasion of Dr. Shi's arrest to essentially steal nearly $600,000 from Dr. Shi. Dr. Shi earned these funds and had every reason to expect to receive them. The only reason Dr. Shi has not received these funds is because of this arrest and now, conviction, which have no relation to the sale of HOE. It is but one more collateral punishment, and one not otherwise accounted for in the Sentencing Guidelines.

Dr. Shi is the sole source of financial support for his family. His wife does not work outside the home where she cares for two young children. Incarceration will mean that the Shi family will lose their sole source of financial support and their health insurance.  Because Dr. Shi's son has severe asthma and requires medication, this prospect is terrifying. Without any income and without the HOE sale proceeds, his family will have no means to support itself.

The devastating impact of this conviction is not limited to financial and health consequences. The notoriety and opprobrium associated with a criminal conviction of this nature for a professional engineer means that Dr. Shi will never have (or be able to regain) the life he had. It is over. And that is the case regardless of the sentence ultimately imposed. These consequences, too, are a form of punishment. *See, e.g.*, *United States v. Anderson*, 533 F.3d 623, 633 (8th Cir.

2008) (upholding below-Guidelines sentence in part because district court found that "defendant had suffered atypical punishment such as the loss of his reputation and his company"); *United States v. Malik*, 424 F. App'x 122, 127 (3d Cir. 2011) (affirming a below-Guidelines sentence in part because the defendant "was punished by the reputational harm he suffered as a result of the criminal action"); *United States v. Redemann*, 295 F. Supp. 2d 887, 894–97 (E.D. Wis. 2003) (downward departure warranted where defendant suffered serious collateral consequences from conviction); *United States v. Samaras*, 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005) (imposing below-Guideline sentence in part because, as a consequence of his conviction and sentence, defendant lost a good public-sector job, a factor not considered by the Guidelines); *United States v. Vigil*, 476 F. Supp. 2d 1231, 1315 (D.N.M. 2007) (in considering justness of sentence, "it is important to consider all other forms of punishment [defendant] has already suffered," including loss of job and damage to his personal and professional reputation); *United States v. Olis*, No. 4:03-cr-00217, 2006 WL 2716048, at *13 (S.D. Tex. Sept 22, 2006) (substantial variance warranted in part because "the attendant negative publicity, the loss of his job and accounting and law licenses, and the need to provide support for his family will provide adequate deterrence against any potential future criminal conduct").

> **E.  A non-custodial sentence would reflect the seriousness of the offense, promote respect for law, and provide just punishment, whereas a sentence based on the Guidelines loss provisions would be excessive and overstate the seriousness of the offense (§ 3553(a)(1), (a)(2)(A)).**

A Guidelines sentence would significantly overstate the seriousness of the offense and would be unjust.

The Court found that the loss amount is $1.05 million. *See* ECF No. 308 at 7. In coming to that conclusion, the Court relied upon a single document, GTX-176, described as a "business plan." *Id.* at 4. The Court noted that the document stated a goal of joining four other syntactic foam

companies, and that its higher-quality, more competitively priced products would eventually net the company a profit of three million dollars. *See id.*

In fact, this business plan was not created by Dr. Shi and there was no evidence proffered by the government that Dr. Shi ever saw it or was aware of its existence. Quite the opposite is true: the business plan was found in Bo's office and did not exist on any of Dr. Shi's devices, in his e-mail, or in his office or home.

As explained in Dr. Shi's Motion for Reconsideration, this business plan was created by Bo and his wife in connection with Bo's H1-B visa application. *See* ECF No. 311. Dr. Shi does not now seek to relitigate the loss amount that the Court has already determined in this filing. But this loss amount enhancement, which rested entirely on this single document written by Bo and his wife to persuade DHS that Bo was working in a thriving and potentially very profitable business, and was never shown to or shared with Dr. Shi.  It is a very slender reed on which to rest such an enormous enhancement.  Moreover, the arithmetic exercise at coming up with some sort of loss number, and then looking at the loss guidelines, suggests an empirical basis that simply does not exist. *See* U.S.S.G. § 2B1.1, cmt. 21(C) ("There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted.").

As part of a court's "obligation to consider whether a sentence other than a Guidelines sentence would be sufficient, but not greater than necessary, to serve the purposes of sentencing," courts "have an obligation to consider whether to depart from the Guidelines sentencing range or to impose a non-Guidelines sentence in every case." *United States v. Corsey*, 723 F.3d 366, 382 (2d Cir. 2013) (Underhill, J., concurring). This duty "will frequently require judges applying the loss guideline to evaluate whether the calculated Guidelines range substantially overstates the

seriousness of a crime." *Id.*; *see also* U.S.S.G. § 2B1.1, cmt. 21(c).

> **1.    The Guidelines' loss-amount table has been questioned by courts around the country.**

Courts have increasingly recognized that "unless applied with great care," the loss guidelines "can lead to unreasonable sentences that are inconsistent with what § 3553 requires," and thus may require a significant downward variance. *Corsey* 723 F.3d at 379. As Judge Rakoff explained, strict adherence to the loss guidelines can result in an "utter travesty of justice . . . from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense." *United States v. Adelson*, 441 F. Supp. 2d. 506, 512 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008). That principle applies with particular force in this case.

Indeed, other courts have urged judges to consider a downward variance in cases where, as here, the loss enhancement dwarfs the base offense level, distorting the resulting Guidelines range and overwhelming the § 3553 factors. For example, the Second Circuit recently questioned the wisdom of the loss guidelines for this very reason. *See United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016). Judge Newman acknowledged that the district court's loss-related "increases complied with the Guidelines Manual," and that "the Commission had the authority to construct a set of guidelines that used loss amount as the predominant determination of the adjusted offense level for monetary offenses." *Id.* But he cautioned that while "[t]his approach, unknown to other sentencing systems, was one the Commission was entitled to take, . . . its unusualness is a circumstance that a sentencing court is entitled to consider." *Id.* The district court in *Algahaim* had increased one defendant's base offense level of 6 to an adjusted offense level of 18 because of the loss amount—a "three-fold increase." *Id.* And it increased a second defendant's offense level from a base of 6 to an adjusted level of 16, also because of the loss amount. *See id.* Noting the sharp

increase due to the loss guidelines, the Second Circuit remanded for resentencing, concluding that "[w]here the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence." *Id.*

Here, the loss amount enhancements would increase Dr. Shi's offense level even more than they did in *Algahaim*. Dr. Shi's base offense level is 6 (yielding a guideline sentence of 0–6 months), and the PSR has found that the loss amount enhancement is 12, yielding a guideline level of 18, yielding a sentence of 27-33 months before any other enhancements. This is a more than three-fold increase to the base offense level—for a case that involves zero *actual* loss to the victim, as conceded by the government. Thus, as in *Algahaim*, this Court should meaningfully consider whether a sentence based on the loss amount calculation is appropriate. In the circumstances of this case, as explained in greater detail below, it is not.

The loss guidelines were developed in a way that renders them "fundamentally flawed, especially as loss amounts climb." *Corsey*, 723 F.3d at 380 (Underhill, J., concurring); *see also United States v. Johnson*, 16-cr-457-1, 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018). Specifically, the loss table, unlike certain other sections of the Guidelines, "was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices." *Corsey*, 723 F.3d at 379; *accord Johnson*, 2018 WL 1997975, at *3. As Judge Underhill explained:

> The higher the loss amount, the more distorted is the guideline's advice to sentencing judges. As a well-known sentencing commentator has put it, "For the small class of defendants . . . convicted of fraud offenses associated with very large guidelines loss calculations, the guidelines now are divorced both from the objectives of Section 3553(a) and, frankly, from common sense. Accordingly, the guidelines calculations in such cases are of diminished value to sentencing judges."

*Corsey*, 723 F.3d at 380 (quoting Frank O. Bowman, III, *Sentencing High-Loss Corporate Insider*

*Frauds After <u>Booker</u>*, 20 Fed. Sent'g. Rep. 167, 168 (2008)).

This is why courts throughout the country have found that the loss guidelines result in unreasonable sentencing ranges when there is a substantial loss amount. *See, e.g.*, *id.* ("Where the Sentencing Guidelines provide reasonable guidance, they are of considerable help to any judge in fashioning a sentence that is fair, just, and reasonable. But where, as here, the calculations under the Guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences."); *Johnson*, 2018 WL 1997975, at *3 (departing from a Guideline range of 87–108 months to a 24-month sentence, and observing that "because the loss Guideline was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices . . . , district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that guideline provides" (quotation marks omitted)); *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) ("By making a Guidelines sentence turn, for all practical purposes, on [loss enhancement], the Sentencing Commission . . . effectively guaranteed that many such sentences would be irrational on their face."), *aff'd*, 747 F.3d 111 (2d Cir. 2014); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2014) (noting that the Guidelines place "undue" and "excessive weight" on the loss amount); *United States v. Ranum*, 353 F. Supp. 2d 984, 990 (E.D. Wis. 2005) ("One of the primary limitations of the guidelines, particularly in white-collar cases, is their mechanical correlation between loss and offense level.").[9]

---

[9] This is why courts routinely impose below-Guidelines sentences in fraud cases. *See, e.g.*, *United States v. Percival Zhang*, No. 7:17-cr-0073, ECF No. 222 (W.D. Va 2019) (time served despite a Guidelines range of 51–63 months); *United States v. Collins*, No. 07-cr-1170, ECF No. 244

The loss guidelines are ill-equipped to consider the nature and seriousness of a particular offense, especially a conspiracy to steal trade secrets. As Judge Garaufis recently explained, the loss guidelines are flawed in part because of "the weakness of the correlation between loss and moral seriousness; the rigidity of the loss amount overriding the diverse reality of complex financial crimes; the lack of any consideration of danger to society; and so on." *Johnson*, 2018 WL 1997975, at *4. He added:

> As far as this court can tell, the Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime. . . . Given the feeble underpinnings of the loss enhancement, it is particularly galling that this factor is often more or less *solely* responsible for a white-collar offender's Guideline sentence. . . . I agree with Judge Underhill, and refuse to mechanistically impose such an illogical sentence. That this situation continues unabated is a great shame for many offenders sentenced under this Guideline who do not receive a sentence that makes any sense for the actual crime of conviction.

*Id.* at *3. Contrary to the Guidelines approach, not all loss amounts should be treated the same in terms of culpability because "not all actual loss is equally serious." *Corsey*, 723 F.3d at 381 (Underhill, J., concurring). Indeed, "[a] fraud that results in the loss of even a few thousand dollars by an elderly or sick person who, as a result of the loss, becomes unable to afford the necessities of life or medical care is much more serious than a fraud that results in ten or a hundred times that

---

(S.D.N.Y. Oct. 17, 2013) (Sentencing Tr. at 36) (a year and a day despite Guidelines sentence of life imprisonment); *United States v. Treacy*, No. 08-cr-366, ECF No. 130 (S.D.N.Y. Sept. 2, 2009) (24-month sentence despite Guidelines range of 121–151 months); *United States v. Graham*, No. 06-cr-137, ECF No. 1266 (D. Conn. Apr. 30, 2009) (a year and a day despite Guidelines sentence of life imprisonment); *United States v. Milton*, No. 3:06-cr-137, ECF No. 1216 (D. Conn. Jan. 30, 2009) (48-month sentence despite Guidelines sentence of life imprisonment); *United States v. Turkcan*, No. 08-cr-428, ECF No. 52 (E.D. Mo. June 11, 2009) (a year and a day despite Guidelines range of 63–78 months); *United States v. Parris*, 573 F. Supp. 2d 744, 745, 754 (E.D.N.Y. 2008) (60-month sentence despite Guidelines range of 360 months to life); *United States v. Ferguson*, No. 3:06-cr-137, ECF No. 1199 (D. Conn. Dec. 31, 2008) (sentences ranging from a year and a day to four years despite Guidelines ranges including life imprisonment); *Adelson*, 441 F. Supp. 2d at 514 (42-month sentence despite Guidelines sentence of life imprisonment).

loss by a large corporation able to absorb the financial consequences without a need to close plants, fire employees or even declare the loss as material in public financial reports. Simply put, contrary to the assumption underlying the loss guideline, not all dollars of loss are fungible." *Id.*

As then-District Judge Lynch explained, "[i]n many cases, . . . the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence." *Emmenegger*, 329 F. Supp. 2d at 427. In reality, "the particular amount stolen is not as significant," and "[w]ere less emphasis placed on the overly-rigid loss table, the identification of different types of fraud or theft offenses of greater or lesser moral culpability or danger to society would perhaps assume greater significance in assessing the seriousness of different frauds." *Id.* at 427–28.

2.      **The Guidelines overstate the seriousness of Dr. Shi's offense.**

The foregoing principles are especially applicable in this case, where the loss guidelines overstate the seriousness of the offense. Indeed, cases like are far more typically handled as a civil lawsuit, alleging misappropriation of intellectual property. In 2017, 1,134 civil cases alleging misappropriation of trade secrets were filed in U.S. District courts.[10] It is hardly an uncommon occurrence that a business will do what CBMI did here: hire ex-employees from a competitor which leads to allegations that trade secrets have been compromised. There is nothing inherently different about the conduct alleged in this case than that which is alleged in civil lawsuits involving similar conduct or, indeed, conduct that is far more serious. For example, a Wisconsin jury awarded $420 million in damages, and found that the defendant committed "wilful and malicious" misappropriation of trade secrets, yet no criminal charges were brought. *Epic Sys. Corp. v. Tata Consultancy Servs., Ltd.*, No. 14-cv-748 (W.D. Wis. Oct. 31, 2014), ECF No. 976. Similarly, a

---

[10] Steve Brachman, "Reports Shows Significant Increase in Trade Secret Litigation Since Passage of DTSA," IP Watchdog (July 27, 2018), www.ipwatchdog.com/2018/07/27/reports-increase-trade-secret-litigation-dtsa/id=99646/

plaintiff in Texas was awarded $44.4 million in damages, including $18.2 million in punitive damages and, nevertheless, no criminal charges were brought in connection with this case, either. *See Wellogix Inc. v. BP Am. Inc.*, No. 3:08-cv-00119 (S.D. Tex. Nov. 4, 2011), ECF No. 339. And in 2016, a jury awarded damages of $70 million against a Canadian company which misappropriated the victim's confidential and proprietary technology in order to develop their own competitive product, but, again, no criminal charges were brought. *See CardiAQ Valve Techs., Inc. v. Neovasc Inc.*, No. 14-cv-12405-ADB (D. Mass. Nov. 24, 2017), ECF No. 598.

That the Sentencing Guidelines for Dr. Shi's conduct recommend a sentence of 63 – 78 months but the same type of conduct (or even far more egregious conduct) typically results in nothing more than a civil lawsuit with a financial penalty suggests that the Guidelines greatly overstate the seriousness of this particular offense.

Had CBMF been a Dutch, Canadian, or French company, it is highly unlikely that the FBI would have had any interest in pursuing this investigation. The government's intense focus on China[11] has resulted in minor transgressions being treated as foreign espionage. Then-Deputy Attorney General Rod Rosenstein said: "More than 90 percent of the [DOJ's] cases alleging economic espionage over the past seven years involve China. More than two-thirds of the Department's cases involving thefts of trade secrets are connected to China."[12] Yet a review of the civil dockets around the country suggests that theft of trade secrets is hardly confined to individuals

---

[11] On November 1, 2018, the Department of Justice announced its "China Initiative," an unprecedented push to "identify priority Chinese trade theft cases" for criminal prosecution. Press Release, U.S. Dep't of Justice, "Attorney General Jeff Sessions Announces New Initiative to Combat Chinese Economic Espionage" (Nov. 1, 2018), www.justice.gov/opa/speech/attorney-general-jeff-sessions-announces-new-initiative-combat-chinese-economic-espionage.

[12] Press Release, U.S. Dep't of Justice, "Deputy Attorney General Rod J. Rosenstein Announces Charges Against Chinese Hackers" (Dec. 20, 2018), www.justice.gov/opa/speech/deputy-attorney-general-rod-j-rosenstein-announces-charges-against-chinese-hackers.

and companies associated with China. The difference is that the FBI is keen on turning cases that have a China connection into federal criminal prosecutions.

That was true here. The government tried (unsuccessfully) to cast Dr. Shi as a Chinese economic spy working to benefit the "Chinese motherland." The jury rejected those charges and returned a guilty verdict only on theft of trade secrets.

### F.   A non-custodial sentence affords adequate deterrence.

As a result of being convicted in this case—regardless of the sentence imposed—Dr. Shi has already lost virtually everything: his career, his reputation, his business, his prospect of making a decent income, and his financial security. And he faces the prospect of being separated from his young children. All of these outcomes are a direct consequence of this conviction irrespective of any period of incarceration. No one would consider these consequences and believe that committing theft of trade secrets is a worthwhile risk. Any rational businessman would unquestionably be deterred by the possibility of *any* of these consequences—not to mention all of them combined—even if no period of incarceration is imposed.

"[E]ven relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." *Adelson*, 441 F. Supp. 2d at 514. And there can be no doubt that "any amount of prison time is a serious amount of prison time." *Johnson*, 2018 WL 1997975, at *5.

### G.   A non-custodial sentence is warranted because Dr. Shi poses no threat to the public (§ 3553(a)(2)(C)).

With the exception of the present criminal proceeding, Dr. Shi has never been accused of wrongdoing. As such, nothing in his past suggests any criminal tendencies. After his arrest, Dr. Shi has been a model defendant, in absolute compliance with all of his release conditions. *See* ECF No. 289 at 17:24-18:2 ("THE COURT: . . . . You should convey to [Dr. Shi] that obviously I will be the person who's sentencing him and that his compliance with [release] conditions will be

something that I will take into account at sentencing."). As a result of his conviction and loss of his engineering license, Dr. Shi will not be able to work in his chosen profession and thus could not reoffend. There is therefore no risk of recidivism. Thus, this factor does not support a custodial sentence, let alone one within the Guidelines range.

### H.   A non-custodial sentence is warranted because Dr. Shi requires no correctional treatment (§ 3553(a)(2)(D)).

Dr. Shi does not require any educational or vocational training, medical care, or other correctional treatment that would warrant a custodial sentence, let alone one within the Guidelines range. This supports a sentence without incarceration.

### I.   The need to avoid unwarranted sentencing disparities among defendants supports a non-custodial sentence (§ 3553(a)(6)).

One of the fundamental goals of the Sentencing Guidelines is to avoid sentencing disparities, such that similarly situated defendants are treated similarly. *See* 18 U.S.C. § 3553(a)(6) ("The court . . . shall consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . . ."); *Booker*, 543 U.S. at 253–54 ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity. That uniformity does not consist simply of similar sentences for those convicted of violations of the same statute . . . . It consists, more importantly, of similar relationships between sentences and real conduct, relationships that Congress' sentencing statutes helped to advance . . . ." (citation omitted)).

A review of similar theft of trade secrets cases prosecuted around the country makes clear that defendants charged in more serious crimes—involving losses far greater and/or more egregious conduct—are routinely given below-guideline and, very often, non-custodial sentences. For example:

***United States v. Xie***, No. 14-cr-205 (E.D. Wis. 2014):

- Defendant was an application engineer for GE Healthcare and wrote source code for MRI technology software.
- After defendant's family left for China, he decided to join them, but not before downloading 2.4 million files from GE over a two-month period.
- Defendant then sent GE's stolen files to his family in China so that he could form his own business overseas.
- Defendant was apprehended just days before flying to China.
- Defendant pled to one count of theft of trade secrets and acknowledged that the loss amount was between $100-200 million leading to an offense level of 30.
- Defendant was sentenced to 24 months of probation.

***United States v. Robert & Howley***, No. 08-cr-175 (E.D. Tenn. 2008):
- Defendants were employees of Wyko US, a tire technology company, whose parent company, Wyko Group, was based in England.
- Wyko China, a subsidiary of Wyko Group, won a $1.2 million contract with a Chinese rubber company.
- The contract was for a heavy-duty tire that required a "swab down system," something Wyko had never produced.
- Defendants traveled to Kansas to visit Goodyear Tire's facility, and pretended they were there on behalf of Wyko US to assist with a joint project. While there, they signed Goodyear confidentiality agreements before secretly photographing and copying Goodyear's "swab down" products. They sent the photographs to Wyko's office in England.
- The jury convicted the defendants on 10 counts, including theft of trade secrets and transmission of trade secrets.
- The Court found that the defendants knew that they were working for an instrument of the Chinese government, and found a loss amount of $307,000.
- Despite a Guideline range of 37-46 months imprisonment, both defendants were sentenced to 48 months of probation and 150 hours of community service.

***United States v. Yang***, No. 11-cr-458 (N.D. Ill. 2011):
- Defendant was a software engineer for the Chicago Mercantile Exchange ("CME") who downloaded over 20,000 files over a six-month period from CME's computers.
- Defendant then tried to form a new company in China with two Chinese business partners that would increase trade volume on China's chemical trading exchange.
- Defendant pled guilty to two counts of stealing CME's source code and selling it to a Chinese exchange.
- The government and probation submitted a loss amount of $23 million, and an offense level of 25.
- The court rejected the loss calculation, found a Guideline range of 30-37 months, but imposed a sentence of 48 months of probation.

***United States v. Xiang***, No. 14-cr-160 (M.D.N.C. 2014):
- Defendant worked at RF Micro Devices ("RFMD"), a radio component company, first as an engineer, and later as an International Sales Manager in China.

- Over three years, the defendant and his co-conspirators stole trade secrets from RFMD's computer network, and sent them to third-party emails to avoid detection.
- The defendant and his co-conspirators then founded two competitor companies.
- Despite a 10-level loss enhancement,  defendant was sentenced to 60 months of probation, a $175,000 fine, and $127,657.16 in restitution.

***United States v. Zhang***, No. 10-cr-827 (N.D. Cal. 2010):
- As a senior software engineer and director of software development at SiRF Tech., defendant downloaded over 100,000 files with millions of lines of source code valued at $1.7 million.
- Defendant intended to use this code at a company he founded prior to accepting a position at SiRF.
- Defendant never disclosed to his employer during his seven-year tenure with SiRF that he owned a competing company. Defendant also recruited co-workers from SiRF to join his company.
- Defendant received a sentence of 60 months of probation and a $20,000 fine.

***United States v. Tezock***, No. 3:14-cr-00211 (N.D. Tex. 2014):
- Defendant was fired from Voltaix, a chemical manufacturer that made Germane, a special gas that is difficult to develop. Before leaving, he began compiling Germane-related trade secrets for his own company, which manufactured, produced, purified, and sold Germane based on Voltaix's technology.
- Over nearly six years, the defendant used Voltaix's trade secrets to benefit himself and harm Voltaix. He also tried to steal business by soliciting one of Voltaix's biggest customers.
- Defendant then tried to cover up his scheme by lying under oath during civil litigation.
- After pleading guilty to four counts of theft of trade secrets, defendant was sentenced to 60 months of probation and was ordered to pay $4 million restitution.

***United States v. Grande***, No. 3:07-cr-19 (D. Conn 2007):
- Defendant worked for Duracell, where he stole trade secrets via downloads and email, which he then sent to two competitors, who returned the information to Duracell.
- The defendant's goal was to harm Duracell executives by reducing their bonuses, and he was found to have intended a loss of $3 million.
- The Court sentenced the defendant to 60 months of probation, a $7,500 fine, and 200 hours of community service.

***United States v. Qin, et al.***,  No. 10-cr-20454 (E.D. Mich. 2010):
- Defendants were a married couple. The husband worked at an electricity power equipment company, and the wife worked as an engineer for GM.
- Over two-and-a-half years, the wife stole trade secrets relating to hybrid vehicles so that she and her husband could found their own company and make more money.
- The wife sought a reassignment within GM to further gain access to trade secrets related to hybrid technologies.
- The defendants were convicted by a jury of  multiple counts of theft of trade secrets,

and the husband was also convicted of wire fraud and obstruction of justice.

- With a loss amount between $10-20 million, both defendants had a guideline range of 78-97 months in prison. In the case of the wife, the court agreed to lower the offense level to 20, and sentenced her to a below-Guideline sentence of a year and a day, 12 months of supervised release, and a $12,500 fine. For his additional charges, the husband was sentenced to 36 months imprisonment and a $25,000 fine, well-below the Guideline range.

***United States v. O'Rourke***, No. 17-cr-495 (N.D. Ill. 2017):
- Defendant worked for chemical manufacturing company, Dura-Bar, for 31 years before accepting an executive-level job at a Chinese chemical company.
- Two days before resigning, defendant downloaded dozens of Dura-Bar's files without authorization. These files included lab reports and other trade secrets.
- A jury found defendant guilty on seven counts of theft of trade secrets.
- Despite founding a loss amount of $333,500 and an offense level of 22, the court found that the Guidelines were "more severe than what's necessary," and "driven in large part by loss calculation…" (O'Rourke Sentencing Tr. 173)
- The defendant received a sentence of a year and a day imprisonment and 36 months of supervised release.

***United States v. Newman***, No. 14-cr-704 (N.D. Ill. 2014):
- Defendant worked as a trader at a firm that developed software for trading computations involving futures, options, and equities.
- The firm maintained strict security over its trade secret software, including banning non-workers from entering the firm.
- The defendant downloaded the firm's secret information on three separate occasions, and then left immediately after receiving his annual bonus to found his own firm, where he planned to use the stolen information.
- According to probation's PSR, the intended loss was between $20-25 million, which, along with other enhancements, led to a Guideline level of 28. Defendant disagreed and argued that loss was most appropriately valued at $2.3 million.
- The Court sentenced the defendant to a year and a day, plus 24 months of supervised release and a $100,000 fine.

***United States v. Mulhollen***, No. 10-cr-13 (W.D. Ky. 2010)
- Defendant attempted to steal "starter tobacco," a key ingredient in making moist tobacco products, from Swedish Match, a Kentucky company. He intended to take the stolen ingredient to the Dominican Republic, where he and his associates planned to start a company to market moist tobacco products to Asia and across South America.
- The Court found an intended loss of $1 million, and sentenced him to a year and a day imprisonment, plus two years of supervised release.

***United States v. Sing***, No. 14-cr-212 (C.D. Cal. 2014):
- Defendant, an employee of the victim company, emailed trade secrets to competitors to cripple the company.
- Probation's PSIR found a $1.2 million loss.

- After being convicted on five counts of unauthorized transmission and possession of a trade secret, the court sentenced the defendant to a year and a day.

***United States. v. Lee***, No. 1:09-cr-290-1 (N.D. Ill. 2009):
- Over a period of five months, the defendant stole trade secrets from his employer, Valspar, ahead of beginning a job with a competitor.
- The Defendant stole 160 formulas for manufacturing paints, sales and pricing data, research, and other materials.
- The elaborate scheme involved gaining access to files that the defendant could not access by having co-workers place desired files in a special folder that he could copy. The defendant deleted his computer history to cover his tracks.
- The defendant also attempted to recruit Valspar's employees to work for him in Asia, including a high-level scientist with knowledge of paint manufacturing.
- The Court found a loss of $7-20 million, resulting in an offense level of 25, but imposed a sentence of 15 months imprisonment and 26 months of supervised release.

By comparison, Dr. Shi's conduct was far less egregious. Unlike the majority of these defendants whose criminal conduct involved repeated thefts by the defendant from the victim company over a long period of time, and then attempts to sell the stolen trade secrets to direct competitors, Dr. Shi hired former Trelleborg employees who had been laid off. Typically, the hiring of laid-off former employees of a rival company resulting in the transference of trade secrets results in, at most, a civil law suit. And even a civil law suit would not be brought if, like here, there were no actual damages caused to the victim company.

Of these employees, Ogoe had been unemployed nearly four years, and there was no evidence that he was asked to provide any trade secrets belonging to Trelleborg. *See* Tr. 1829; 1831–34. Ogoe testified that before being hired, Dr. Shi never asked him if he still had any Trelleborg materials in his possession. *See* Tr. 1829. And Ogoe testified that he was being truthful when he told the FBI in his post-arrest statement that he had never been requested by anyone at CBMI to contact anyone at Trelleborg. *See* Tr. 1831–33; Ex. M at 85 ("Q: Did they ever ask you to contact Trelleborg and ask for particular information?; A: No.").

Nor was there any evidence that Liu's hiring was conditioned on delivering Trelleborg

trade secrets.  Dr. Shi hired Liu because Liu was a PhD candidate capable of developing new or improved syntactic materials.  When interviewed by the FBI, Liu was asked whether Dr. Shi said, "I want you to get this for me? Like, did he put pressure on you? Or did he say, like, I'll only hire you if you bring me this stuff?" Liu: "I don't quite remember. It's, it's been a long time. I don't really remember the instance, like, why I gave this to him or something like that. Yeah. I really don't remember. I wish I did, too."[13] Ex. N at 24. When pressed again by the agents about whether Dr. Shi directed Liu, he again stated: "If you want me to, like, testify that he specifically pressured me I don't really remember that." *Id.* at 25.  It would be difficult to imagine trade secrets being stolen in a more benign manner.

Ogoe stole Trade Secrets 1–3 after cajoling Randall and Uche to share them to help Ogoe save his job. *See* Tr. 1038 (Uche's testimony). And Ogoe admitted to telling the FBI that in reaching out to Randall and Uche, he was simply doing everything possible to keep his job because he felt pressure to perform and was nervous about the possibility of losing his job.[14] *See* Tr. 1830, 1834. Ogoe never testified that he stole Trade Secrets 1–3 at the direction of Dr. Shi or that his outreach to Trelleborg employees was anything other than self-initiated.

Liu stole Trade Secrets 4–7. Critically, Liu had these documents well before CBMI hired him because "he was in the habit of always backing up his documents to a personal thumb drive." Ex. O. Nobody instructed or asked Liu to hack or steal Trade Secrets 4–7 from Trelleborg.

Thus, Dr. Shi's criminal conduct consisted of hiring Liu and the subsequent receipt of

---

[13] Although the government did not provide a transcript of Liu's post-arrest interview, the defense has transcribed the interview. *See* Ex. N.

[14] This is consistent with Uche's testimony that when Ogoe called him, Ogoe said that he needed to re-familiarize himself with how Trelleborg had done things, and that he was not going to share the information with anyone else. *See* Tr. 997, 1001–02, 1038. According to Uche, Ogoe swore that the information was simply for his own use. *See* Tr. 1036–38.

documents that the jury concluded he knew or should have known were Trelleborg trade secrets. This conduct is at the other end of the spectrum of what is typically seen in theft of trade secrets cases, where the defendant knowingly breaks into the computers of the victim company, steals what he is looking for, and then sells the stolen property for profit.  In this case, no CBMI employee was hired away directly from Trelleborg.  The hiring of laid-off Trelleborg employees is far less egregious than any of the conduct described in the cases collected above and is therefore deserving of a less severe punishment.

Judges faced with more egregious facts frequently reject the government's push to impose a rigid Guidelines sentence. A review of all of the convictions for theft of trade secrets under 18 U.S.C. § 1832 since its enactment for which sentencing records were publicly available – which includes 144 individuals, many of whom were also charged with other crimes – reveals that the vast majority received either probationary sentences or less than 12 months of confinement.[15]

---

[15] For a full list of the 144 individuals *see* Ex. P.



In rejecting the guideline sentence as too severe, the sentencing judges made the determination that strictly applying the loss guidelines would cause an injustice. By looking at the other § 3553(a) factors, the judges have used a more common-sense approach and imposed sentences involving either no or minimal incarceration. The same approach should be taken here: the Court should impose a non-custodial sentence with probation or home confinement.

**J.     A non-custodial sentence is available and warranted (§ 3553(a)(3)).**

Under § 3553(a)(3), the Court must consider "the kinds of sentences available." And the Court has complete discretion to impose a non-custodial sentence, such as probation or home detention. The Court also has discretion to impose conditions to such a sentence that are in the public interest.

Courts have recognized that it can be in the public's interest to impose a non-custodial

33

sentence on a defendant who, like Dr. Shi, has significant abilities. For instance, an Ohio court explained that community service would put the defendant's skills as an accountant and lawyer to better use than prison, and that his "abilities [ ] would otherwise be wasted during a more lengthy prison term." *United States v. Smith*, No. 1:06-cr-00394, 2009 WL 249714, at \*4 (N.D. Ohio Feb. 2, 2009). Other courts have agreed. *See, e.g.*, *United States v. Warner*, 792 F.3d 847, 854 (7th Cir. 2015) (affirming sentence of two years of probation despite Guidelines range of 46–57 months where district court found that "society will be best served by allowing [the defendant] to continue his good works . . . outside of prison"); *United States v. Coughlin*, No. 06-cr-20005, 2008 WL 313099, at \*7 (W.D. Ark. Feb. 1, 2008) (imposing a sentence of home confinement, five years of probation, and 1,500 hours of community service to an executive despite a Guidelines range of 27–33 months in part because his "expertise is better put to use than wasted in the physical deterioration of unnecessary imprisonment"). Recently, Judge Torres sentenced Dr. Neumeister, a prominent neurological researcher at Yale and New York University ("NYU"), who pled guilty to stealing from NYU and various grant programs to three years of probation and to play the piano for an hour at least twice a week for three years for elderly group facilities after being alerted to Dr. Neumeister's background as a trained pianist in the pre-sentence investigation report. *See United States v. Neumeister*, No. 18-cr-385, ECF No. 42 (S.D.N.Y. Nov. 7, 2018).

A non-custodial sentence is in the public's and Dr. Shi's best interest in this case. A sentence of home detention with other conditions—such as community service, including helping local engineers or students with academic papers or lab work, coaching ice hockey, or giving music lessons and playing community concerts—would benefit society far more than sending Dr. Shi to prison. Dr. Shi is a greatly talented engineer whose abilities have and can continue to benefit society for, by example, continuing to work on his book, which could greatly benefit new graduates

and engineers, and ensuring HARP stays safe and up-to-date.  To imprison him would be to waste all that he has to offer the public, not to mention his prospect for personal redemption by giving back to the community.

A non-custodial sentence would also avoid the tremendous strain that a custodial sentence would place on Dr. Shi's wife and children. Because Dr. Shi is the sole breadwinner for the family, his confinement will leave the family without any financial or emotional support. A custodial sentence would also be an enormous blow to his young children, who depend on their father's love and guidance. The loss of a parent during these formative years can cause psychological strain and depression, antisocial behavior, trouble at school, and economic hardship—none of which they deserve.[16]

## IV.  <u>CONCLUSION</u>

Dr. Shi not only has no criminal history; he has no prior *arrests*. There can be no serious suggestion that Dr. Shi is at risk to re-offend. A non-custodial sentence of probation or home confinement is appropriate and justified, not to mention in line with sentences for the same offense (plus additional offenses) involving far more egregious conduct. On these facts, a non-custodial

---

[16] *See, e.g.*, DeHart, Shapiro, & Hardin, *The Impact of Incarceration on Families: A Single-Jurisdiction Pilot Study Using Triangulated Administrative Data & Qualitative Interviews*, Office of Justice Programs, Feb. 7, 2017, at 7, www.ncjrs.gov/pdffiles1/nij/grants/250657.pdf ("Parental incarceration may also have a negative impact on children's mental health. Developmental effects may vary by age and might include disrupted attachment, traumatic stress, lowered self-concept, emotional and behavioral reactance, and delinquency."); Eric Martin, *Hidden Consequences: The Impact of Incarceration on Dependent Children*, NIJ Journal No. 278, www.nij.gov/journals/278/pages/impact-of-incarceration-on-dependent-children.aspx ("Family members of incarcerated individuals are often referred to as 'hidden victims'—victims of the criminal justice system who are neither acknowledged nor given a platform to be heard. These hidden victims receive little personal support and do not benefit from the systemic societal mechanisms generally available to direct crime victims, despite their prevalence and their similarities to direct crime victims. Children whose parents are involved in the criminal justice system, in particular, face a host of challenges and difficulties: psychological strain, antisocial behavior, suspension or expulsion from school, economic hardship, and criminal activity.").

sentence is no "slap on the wrist."  The life Dr. Shi knew is over, forever. He is now a convicted

felon, a label that he will be forced to wear for the rest of his life. His once-promising career is

over. His family is close to bankrupt. He owes more than one million dollars in legal fees, and as

a direct result of this case has lost an additional $580,000 that the buyer of his company has refused

to pay him. These consequences are real, tangible, and severe, and they must be considered when

deciding what additional punishment is appropriate.

In the circumstances of this case, a non-custodial sentence is sufficient, and a custodial

sentence would be unnecessary, to satisfy the statutory purposes of sentencing. Such a sentence

accomplishes the goals of sentencing set forth in 18 U.S.C. § 3553.

Dated: February 3, 2020                                   Respectfully submitted,

                                                          */s/ Peter Zeidenberg*_____
                                                          Peter Zeidenberg (Bar No. 440803)
                                                          Taniel Anderson (Bar No. 997406)
                                                          Laura Zell (Bar No. 1044336)
                                                          Michael Dearington (Bar No. 1025086)
                                                          Arent Fox LLP
                                                          1717 K Street, NW
                                                          Washington, DC 20006-5344
                                                          Tel: 202.857.6000
                                                          Fax: 202.857.6395
                                                          peter.zeidenberg@arentfox.com
                                                          taniel.anderson@arentfox.com
                                                          laura.zell@arentfox.com
                                                          michael.dearington@arentfox.com

**CERTIFICATE OF SERVICE**

I hereby certify that on February 3, 2020, I caused to be delivered a true and accurate copy

of the foregoing through the Court's electronic filing system to all counsel of record.


*/s/ Peter Zeidenberg*
Peter Zeidenberg